617 F.2d 29
 5 Fed. R. Evid. Serv. 1097
 INVENTIVE MUSIC LTD., a Corporation of New York, d/b/a
Meadow Music Group, Appellant,
v.
Jack L. COHEN and First National State Bank of New Jersey, a
Corporation of New Jersey, as co-executors of the Estate of
Herman Lubinsky, Sr., Savoy Records Company Inc., a New
Jersey Corporation, and its affiliated companies, Worldwide
Records, Inc., a New Jersey Corporation, Medallion Songs
Inc., a New Jersey Corporation and National Music Publishing
Corp., a New Jersey Corporation and Columbia Pictures
Industries Inc., a Delaware Corporation.
 No. 79-2281.
 United States Court of Appeals,
Third Circuit.
 Submitted under Third Circuit Rule 12(6) Feb. 15, 1980.
Decided Feb. 29, 1980.
 
 Stanley W. Kallmann, Gennet & Kallmann, East Orange, N. J., for appellant.
 Elliott Abrutyn, Morgan, Melhuish, Monaghan & Spielvogel, Livingston, N. J., for appellee Columbia Pictures.
 John C. Heavey, Laurence Reich, George C. Jones, Carpenter, Bennett & Morrissey, Newark, N. J., for appellees Cohen and First National Bank of N. J.
 Before SEITZ, Chief Judge, and VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 This is a diversity case involving questions of New Jersey law concerning finder's fees and tortious interference with economic interests. The plaintiff, Inventive Music Ltd., appeals from the district court's grant of a directed verdict at the close of the plaintiff's case in favor of the defendants Jack L. Cohen and First National State Bank (the co-executor defendants) and Columbia Pictures Industries, Inc. (Columbia).
 
 I.
 
 2
 In reviewing the grant of a directed verdict, this court "must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference." Fireman's Fund Insurance Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). Where there is conflicting or inconclusive evidence, it is for the trier of fact to resolve the conflict and to draw inferences therefrom. With these principles in mind, we turn to the evidence presented by the plaintiff.
 
 
 3
 In December of 1973, Jon C. Meadow, the president of the plaintiff Inventive Music, learned that Savoy Record Co. might be available for sale in the near future. Meadow called an official at Savoy and offered to act as a finder. This official told Meadow to contact defendant Jack L. Cohen, the attorney and business advisor of the owner of Savoy, who would be representing Savoy in connection with any sale. Meadow called Cohen and had numerous discussions with him. On February 25, 1974, Cohen wrote to Meadow that Meadow should not offer Savoy for sale. He added: "on the other hand, if an interested party communicates with us through you, we will recognize you as the finder."
 
 
 4
 Starting in February 1974, Meadow made several attempts to contact officials at defendant Columbia concerning a possible purchase of Savoy. On March 7, Meadow wrote to an official at Columbia. On March 18, Alan Adler, the Columbia employee in charge of acquisitions, tried to call Meadow, but Meadow was not in his office.
 
 
 5
 Meadow testified that he finally reached Adler by phone on June 28, 1974. When Adler asked what company was for sale, Meadow told him that it was Savoy. He also informed Adler that Columbia should deal with Savoy through him. Adler responded that he would have to discuss the matter with Clive Davis, a consultant of Columbia, and that he would get back to Meadow by July 12.
 
 
 6
 Adler testified in his deposition, which was introduced into evidence, that he first contacted Cohen about a possible sale of Savoy on July 9. According to Cohen's testimony, Adler told Cohen at that time that Columbia was not approaching Savoy through a finder.
 
 
 7
 On July 12, Meadow contacted Adler by phone. At that point, Adler informed Meadow that Davis had already been "working on" a Savoy purchase and that Columbia considered the purchase to be an "in-house" deal, rendering Meadow's services unnecessary.
 
 
 8
 Thereafter, on July 15, Meadow wrote to Cohen to inform him that Columbia had learned of Savoy through him, information repeated in a telephone conversation the next day. Cohen testified that he then contacted Adler and told him that if the facts in Meadow's July 15 letter were true, "you have been far from candid with me." In response, Adler told Cohen that Davis and another Columbia employee named Backer had been working on the acquisition prior to Meadow's call on June 28.
 
 
 9
 After the consummation of the sale of Savoy to Columbia, the plaintiff filed this suit to recover a finder's fee from the co-executor defendants[1] and to recover damages from Columbia for tortious interference with the plaintiff's contract with Savoy. At the close of the plaintiff's evidence in a jury trial, the district court granted the co-executor defendants a directed verdict, stating from the bench that Meadow had not been the procuring cause of the contract. The court also granted Columbia's motion for a directed verdict without stating any reasons for its decision.
 
 II. Co-Executor Defendants
 
 10
 On appeal, the defendants have conceded that the basis for the district court's order was that, as a matter of law, Meadow was not the procuring cause of the contract of sale. New Jersey applies the following test to determine whether a person has earned a finder's fee:
 
 
 11
 Ordinarily, for a broker to earn a commission . . . he must establish that he was the "efficient producing cause" in bringing about the sale at least in the sense of causing the seller to negotiate with a customer, produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations.
 
 
 12
 De Benedictis v. Gerechoff, 134 N.J.Super. 238, 339 A.2d 225, 228 (App.Div.1975). Moreover, in this context, "(w)here there is real doubt, the question must be left to the jury." Weinstein v. Clementsen, 20 N.J.Super. 367, 90 A.2d 77, 79 (App.Div.1952).
 
 
 13
 Here, the defendants claim that there is uncontradicted testimony that Davis, Columbia's consultant, was already working on an acquisition of Savoy when Meadow, the plaintiff's president, called Adler, Columbia's employee in charge of acquisitions, on June 28 and told him about Savoy. Thus they claim that Meadow could not have caused Columbia to negotiate with Savoy because the negotiations would have occurred even without his efforts.
 
 
 14
 The defendants point to two portions of testimony to support this theory. First, Adler's deposition reads: "He (Davis) told me . . . that they had been working on this for some time . . . ." Although the plaintiff objected to this as hearsay, the district court permitted it to be read to the jury.
 
 
 15
 The district court committed error in admitting this statement because it is a classic example of hearsay. The witness (Adler) testified as to what the declarant (Davis) told him, and the statement was offered to prove the truth of the matter asserted (that Davis in fact was considering a purchase of Savoy prior to Meadow's call to Adler). See Fed.R.Evid. 801(c). The defendants have pointed to no exception to the hearsay rule that would permit admission of the statement. Accordingly, this statement by Adler cannot form the basis for a directed verdict.
 
 
 16
 Second, Adler's deposition relates that Backer, a Columbia employee working with Davis, showed him some papers:
 
 
 17
 Q: Steve Backer showed you what they had done or were doing.
 
 
 18
 A: I can't say he showed me everything they had done. He gave me some, he showed me some papers and some numbers. He clearly had information and had been talking to someone.
 
 
 19
 Q: Can you identify those papers he showed you?
 
 
 20
 A: No, I don't have them. . . .
 
 
 21
 Q: Do you recall and can you identify what those papers were, were they documents, letters, agreement, what were they?
 
 
 22
 A: No, no. I think he was talking about, Steve Backer was an expert in the jazz area, I think they were lists of artists, or lists of titles, you know, his idea of what he might do with them, they were very general sort of things. I really don't know, I don't recollect any more about that than that.
 
 
 23
 Q: Other than a list of titles, do you recall any other paper or document that he showed you?
 
 
 24
 A: I don't recall but that doesn't seem to mean there wasn't something.
 
 
 25
 The defendants seem to argue that because this evidence was presented as part of the plaintiff's case, plaintiff is bound by what Adler said. We are unpersuaded by this contention.
 
 
 26
 Formerly, a party could not contradict or impeach his own witness. A corollary to this rule was the doctrine that a party was bound by whatever his own witness said. See, e. g., G. Lilly, An Introduction to the Law of Evidence 280-81 (1978). This rule has been abandoned by the Federal Rules of Evidence. Rule 607 states: "The credibility of a witness may be attacked by any party, including the party calling him." Because rule 607 abandons the restriction on impeaching one's own witness, it necessarily follows that a party is not strictly "bound" by his own witness. Thus the question in determining whether a directed verdict was proper is not whether the plaintiff is bound by Adler's deposition, but whether there is uncontradicted, credible, and unimpeached evidence supporting the defendants' theory of the case that the plaintiff was not the producing cause because Columbia was "working on" a Savoy acquisition.
 
 
 27
 Here, the evidence shows the following: Adler admitted that Meadow's call to him in late June was the first he had heard of the availability of Savoy for sale. He also admitted that the first contact between Columbia and Savoy did not occur until after Meadow's call. The only evidence presented that Meadow was not the cause was a statement of one of Columbia's own employees (Adler) that another employee (Backer) showed him some general information about Savoy, such as a list of the records put out by Savoy. This shows only that Columbia was aware of Savoy's possible availability. It does not prove that Columbia had decided to contact and negotiate with Savoy, nor does it negate the possibility that Meadow caused Columbia to contact Savoy and commence negotiations. Indeed, Adler could not remember whether Davis and Backer had even started to study factors relevant to a possible purchase, such as financial information or proposed agreements. Because Davis was a consultant who specialized in these types of acquisitions, it would be quite natural for him to have the kind of information that Adler specified on any number of firms.[2]
 
 
 28
 Given that New Jersey favors sending doubtful cases to the jury, Weinstein, supra, we do not think that it would hold that the mere fact that the buyer had some general information about the seller proves, as a matter of law, that the plaintiff here was not the efficient producing cause in the sense of prompting the buyer to commence negotiations with the seller. Accordingly, we hold that the question of whether the plaintiff was the efficient producing cause of the negotiations was one for the jury and that the district court's grant of a directed verdict in favor of the co-executor defendants was impermissible here.
 
 III. Columbia
 
 29
 In addition to the above argument, Columbia claims that the directed verdict as to it was proper because the evidence fails to establish that Columbia tortiously interfered with the plaintiff's contract with Savoy. In cases of tortious interference, New Jersey applies a test that requires the jury to consider whether the defendant's conduct was "both injurious and transgressive of generally accepted standards of common morality or of law." Association Group Life, Inc. v. Catholic War Veterans, 120 N.J.Super. 85, 293 A.2d 408, 415 (App.Div.1971), modified on other grounds, 61 N.J. 150, 293 A.2d 382 (1972) (per curiam). In addition, New Jersey has held that there may be tortious interference if a buyer misrepresents facts to a seller in a manner that deprives a broker of a commission. E. g., McCue v. Deppert, 21 N.J.Super. 591, 91 A.2d 503 (App.Div.1952).
 
 
 30
 Here, the evidence, read in the light most favorable to the plaintiff, shows the following: According to Cohen, when Adler contacted him on July 9, Adler assured him that there had been no broker involved in Columbia's decision to contact Savoy. After Meadow wrote to Cohen claiming he had gotten Columbia to call Savoy, Cohen reproached Adler for being less than honest with him. At that time, Adler told Cohen that Columbia had been working on the possibility of acquiring Savoy.
 
 
 31
 Given our holding in the previous section, the jury could have found that Adler, the buyer's representative, was not telling Cohen, the seller's representative, the truth when he said Davis had been "working on" the Savoy purchase prior to Meadow's June 28 call. If so, then that conduct would fall within the rule of McCue, supra, that a buyer may not deprive a broker of a commission by making misrepresentations to the seller.
 
 
 32
 Columbia argues that in any event, once Adler informed Cohen that Columbia was "working on" a Savoy acquisition prior to Meadow's call, Savoy had ample opportunity to investigate the matter on its own instead of relying on Adler's version of events. Because of the nature of New Jersey's legal test, which requires a broad ranging inquiry into the defendant's conduct, we think it is a question for the jury whether Columbia did not interfere with the plaintiff's contract because Adler told Cohen that Columbia had been working on the deal or whether Columbia should have taken further action to ensure that the plaintiff's contractual right was not harmed.
 
 
 33
 Finally, Columbia asserts that even if it harmed the plaintiff's contract right, Columbia itself received no financial benefit from its wrongdoing. We need not decide whether the defendant's economic benefit is a prerequisite under New Jersey law in a suit for tortious interference. The plaintiff introduced evidence that the Columbia-Savoy contract price was lower than the asking price. Thus the jury could have believed that if Adler had not misled Cohen about Savoy's liability to the plaintiff for a commission, then Savoy would have required a higher purchase price to cover its liability to the plaintiff. Accordingly, there was evidence from which the jury could conclude that Columbia derived a financial benefit from its alleged misconduct.
 
 
 34
 We hold that the grant of a directed verdict to Columbia was not warranted.
 
 IV.
 
 35
 We will reverse the judgment of the district court.
 
 
 
 [1]
 Herman Lubinsky, who controlled Savoy, died on March 24, 1974. These defendants are his co-executors
 
 
 [2]
 Davis testified out of turn as one of the defendants' witnesses. Although the defendants have not relied on his testimony as justifying a directed verdict, we have examined it and feel it is subject to the same problems as Adler's deposition. For example, Davis stated that prior to Adler's contacting him, he had not examined Savoy's profits and losses nor did he know the asking price or who to contact at Savoy in case Columbia was interested