BARCO URBAN RENEWAL CORP.,
Appellant in No. 81–2082,

v.

HOUSING AUTHORITY OF The CITY OF ATLANTIC CITY and Resorts International, Inc.

BARCO URBAN RENEWAL CORP.

v.

HOUSING AUTHORITY OF The CITY OF ATLANTIC CITY and Resorts International, Inc.

Appeal of RESORTS INTERNATIONAL, INC. ("Resorts"), Appellant in No. 81–2467.

BARCO URBAN RENEWAL CORP.

v.

HOUSING AUTHORITY OF THE CITY OF ATLANTIC CITY and Resorts International, Inc., Housing Authority of the City of Atlantic City ("The Authority"), Appellant in No. 81–2468.

Nos. 81–2082, 81–2467 and 81–2468.

United States Court of Appeals, Third Circuit.

Argued Jan. 21, 1982.
Decided March 12, 1982.

Edwin P. Rome, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellant in No. 81-2082 and cross-appellee in Nos. 81-2467/8.

Charles Lee Harp, Jr., Archer, Greiner & Read, Harronfield, N.J., for appellee in Nos. 81-2082 and 81-2467 and cross-appellant in No. 81-2468.

Paul M. Brown, Whitman & Ransom, New York City, for appellee in Nos. 81-2468 and 81-2082 and appellant in No. 81-2467.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question for decision in this diversity case tried non-jury under New Jersey law is whether the district court erred in determining that a right of first refusal in a land sale contract had expired. The litigation arose out of the Atlantic City Housing Authority's attempts to redevelop a large parcel of Boardwalk property with appellant Barco Urban Renewal Corporation in 1969 and with appellee Resorts International, Inc., in 1977. The district court denied Barco's request for specific performance of the right of first refusal or any other relief, denied Resorts International's and the Housing Authority's counterclaims, and dismissed Resorts' cross-claim as moot. Barco has appealed and Resorts and the Housing Authority have cross appealed. We affirm the district court in all respects.

I.

In 1965, appellee Atlantic City Housing Authority acquired an eighty-acre tract fronting on the Boardwalk in central Atlantic City called the Uptown Urban Renewal Project using $30 million in loans and grants from the United States Department of Housing and Urban Development.[1]

---

1. The tract is located in the area of the Steel Pier and its boundaries are the Boardwalk and Virginia, Atlantic, and Connecticut Avenues.

HUD conditioned its financial assistance on approval of the local urban renewal plan adopted by the city the same year. Under that plan, once the land was cleared, redevelopment would be carried out by private concerns who would be permitted to buy the property at a low price on conditions assuring that it would be developed in a specified manner. HUD regulations require redevelopment to conform to the local agency's approved urban renewal plan and bar final conveyance of the land to the redeveloper until the local agency is satisfied that the redeveloper is prepared to move forward expeditiously.[2]

In the summer of 1968, Gustave Amsterdam and Goldie Hoffman, two experienced urban redevelopers with substantial financial resources, became interested in undertaking the project. Amsterdam was then president and chairman of the board of Bankers Securities Corporation, a Philadelphia-based holding and financial management company with substantial assets, and also chairman of the Philadelphia Redevelopment Authority, a public agency with responsibility for urban renewal in that city. Hoffman was a member of the Philadelphia Redevelopment Authority and a prominent businesswoman with substantial real estate holdings in Philadelphia and Lancaster, Pennsylvania, and in Atlantic City. She was then engaged in redevelopment of downtown Lancaster.

Impressed by Hoffman's and Amsterdam's financial credentials and experience in urban redevelopment, Mrs. Pauline Hill, executive director of the Housing Authority from 1962 to 1972, met with the pair on several occasions in July 1968 to discuss the Uptown Project. Amsterdam proposed that Bankers Securities Corporation and Mrs. Goldie Hoffman be preselected as sponsors and redevelopers of the Uptown Project, promising to "go forward with the preparation of an overall scheme of development" as soon as the preselection was approved. App. at 460e. The Housing Authority accepted Amsterdam's proposal on August 30, 1968, subject to HUD approval. Bankers Securities and Hoffman, in turn, formed the Barco Urban Renewal Corporation, the plaintiff and appellant in this case, to undertake the Uptown Redevelopment Project.[3] HUD approved the parties' proposed land sale contract with certain modifications,[4] "[p]rovided the Disposal Contract is fully executed within 3 months and all land is conveyed within 63 months from the date of this letter." App. at 4e. The Authority and Barco accepted HUD's modifications and executed the contract on April 22, 1969.

The contract consisted of two parts. Part I included the terms negotiated by the

**2.** A communication from HUD to local urban renewal agencies in 1967 explained HUD's policies against speculation in funded projects:

> Sections 105(b) and 106(c)(7) of the Housing Act of 1949, as amended [42 U.S.C. §§ 1455(b), 1456(c)(7)], charge the Secretary of Housing and Urban Development with responsibility to take appropriate measures to prevent speculation in land holdings and to secure construction of improvements on project land sold or leased to redevelopers. [Local agencies] are charged with these responsibilities by the terms of their loan and grant contracts.
>
> The basic requirement imposed by the law and the loan and grant contracts is that redevelopers are to be required to perform all redevelopment work contracted for, and are not to be permitted to hold project land without so performing in order to benefit by increments in value that result solely from redevelopment work performed by others and from general market conditions. This re-

quirement applies to all disposition transactions and is effective until completion of construction.

Department of Housing and Urban Development, Renewal Assistance Administration, Local Public Agency Letter No. 437 (October 13, 1967), *reprinted in* app. at 1248e.

**3.** Amsterdam and Hoffman were Barco's principal officers, and Bankers Securities and Hoffman each owned 50% of its stock. Mrs. Hoffman died in March 1971, and Barco is now a wholly-owned subsidiary of Bankers Securities Corporation.

**4.** Calling the Authority's attention to Local Public Agency Letter No. 437, quoted in note 2, *supra*, HUD commented that the draft agreement "proposes to modify anti-speculation provisions of the model guide form contract." App. at 5e. In response, the parties agreed to incorporate in the contract a reference to Letter No. 437. *See* app. at 8e.

parties, and Part II consisted of a standard HUD form required to be made a part of all such redevelopment contracts. The contract provided for immediate conveyance of one parcel,[5] but because the existing Urban Renewal Plan did not permit the type of use and development that was contemplated by the parties, it did not contain a precise schedule for conveyance of the remaining property within the Uptown Project. The order, time of acquisition, and purchase price for the remaining parcels were left for future negotiations once the Authority secured the necessary amendments to the Urban Renewal Plan. Thereafter, the parties were obligated to enter into a supplemental agreement settling these terms. The contract required conveyance of all properties no later than April 22, 1974, five years from the date of its execution.

In addition to provisions permitting termination for default, the agreement provided that either party could terminate the agreement if the parties failed to achieve the projected supplemental agreement within a reasonable time. This term provided, however, that if the Housing Authority exercised its right to terminate, Barco would have a right of first refusal on subsequent offers to develop the property:

> [T]he Agency shall ... give written notice to the Redeveloper of the terms of any bona fide offer or offers to redevelop any portion or all of the Property which the Agency is willing to accept and the Redeveloper shall have the exclusive right for a period of thirty (30) days after receipt of each such notice to submit an offer in writing to the Agency on the same terms as set forth in the notice, which offer shall be accepted by the Agency.

App. at 29e–30e. According to testimony of Mrs. Helen Chait, the attorney who negotiated the contract on behalf of Barco, the genesis of the provision was Barco's apprehension about committing itself to this substantial venture before the urban renewal plan was amended to allow it.

Barco feared that an unreasonable refusal by the Authority to agree to supplemental terms would squeeze it out or force it to accept unfavorable terms after it had expended large sums preparing plans and arranging for construction to begin. Moreover, Barco did not yet know the total price for the property—although the Authority suggested a figure somewhat higher than $6 million—or the details of the Authority's final plan. Originally proposed as Barco's right alone, the Authority asked that the right to terminate for failure to reach a supplemental agreement be made mutual. This was done with the addition of "this right of first refusal in the event the authority terminated without cause." App. at 590–91. The district court credited Chait's testimony, and in addition found that the right of first refusal provision "was a trade-off for Barco's prompt development of, and extensive investment in, Parcel 1, the Beachgate property," the first parcel conveyed under the agreement. District court op. at 27, app. at 1897.

The parties never discussed how long Barco would retain the right of first refusal, and nothing in the contract specifically limited its duration. "Unfortunately, and perhaps ironically, it is the inattention to this particular detail which gave rise to this litigation." District court op. at 28, app. at 1898. The district court carefully reviewed the testimony and concluded "that the right of first refusal was to endure for a reasonable time ...," id. at 30, app. at 1900, a holding not challenged on appeal. Rather, the controversy is focused on the court's further determination that a reasonable period under the contract would not extend beyond April 22, 1974, the contractual deadline for conveyance of all property subject to the agreement.

## II.

Unfortunately, once the contract was executed a state of serenity did not long prevail. The district court found that "Amsterdam's original zeal and enthusiasm for

---

**5.** This parcel, known as Beachgate, was conveyed on May 7, 1969, and Barco thereafter built a series of condominium units on it as the contract required.

the project was dampened" by discouraging sales of the condominiums built on the first tract (Beachgate) and other problems on the project. *Id.* at 23, app. at 1893. "Evidently, Barco sought to delay further commitments and postpone moving forward until the climate changed." *Id.* First manifesting itself in June 1969, the Authority expressed increasing dissatisfaction with the pace of Barco's development of the tract. Pressures from the mayor and citizen groups mounted. According to Amsterdam's testimony, Barco felt that the Authority did not promptly furnish the information it needed to permit Barco to move ahead. The Authority and citizen groups, on the other hand, blamed Barco for failing to submit the construction plans, evidence of financing, and timetables required by the contract.

The controversy erupted over the second parcel to be conveyed and improved. First scheduled for July 1971, Barco was granted an extension to January, 1972 to "take down" the tract. Despite requests by the Authority, Barco neglected to provide information required under the contract for the conveyance. In late November, Barco threatened to abandon the project because of community and Housing Authority pressures unless given assurances of the Housing Authority's cooperation. Barco promised to submit a proposed timetable for development upon receipt of the requested assurances, but with an important reservation:

> Because our experience to date indicates beyond any question, that many things outside our control (Governmental action, Civic cooperation, financial support in an area shunned by all normal financing sources) will dictate the timetable by which the redevelopment proceeds, we would not be willing to guarantee specific dates, except subject to all contingencies which have in the past, and may in the future, affect this timetable.

App. at 125e–26e. The Authority responded on December 3 by adopting unanimously a resolution assuring Barco of "its maximum cooperation, with the proviso that the Barco Urban Renewal Corporation furnish

to the Housing Authority, the timetable for the ... developments currently proposed...." *Id.* at 571e.

When Barco asked for another sixty-day extension on January 27, the Authority refused and resolved to terminate the contract. Counsel for the Authority wrote Barco on February 9, enclosing a check in the amount of Barco's deposit and stating that the Authority had resolved to terminate the agreement "on the basis of the provisions of the agreement for the failure to reach an agreement as to all of the requisite provisions of a supplemental agreement within a reasonable time...." App. at 137e. The letter added that Barco would have "the same right to submit proposals as any other party, but ... the original contract is no longer of any force or effect."

Barco resisted the termination. In a letter to the Chairman of the Authority, dated February 16, 1972, Barco suggested that the termination was not "in good faith" and that it would "continue to consider the agreement of April 22, 1969 to be in full force and effect." *Id.* at 138e–39e. The letter also called the Authority's attention to the first refusal provision:

> Even if our agreement were properly terminated, the statement that we have the same right to submit proposals as any other party is erroneous. Our agreement provides that in the event of such termination, we have an exclusive right of first refusal as to any proposal by another party which you are prepared to accept.

*Id.* at 139e.

Following a fruitless attempt by HUD to mediate a settlement of the dispute, the Housing Authority launched a massive advertising campaign in an effort to market the Uptown property. No redevelopers responded with serious, comprehensive plans, but two small parcels of the tract were conveyed in 1973 and 1974 for redevelopment. Although Amsterdam testified that he knew about these projects, Barco did not then choose to assert its contractual right.

Four years after the termination of the contract, in May 1976, appellee Resorts International learned of the Atlantic City gambling referendum scheduled for November 1976, and decided to explore the prospects of investing in Atlantic City. Meetings were held with Housing Authority officials, and on May 20 the Authority approved Resorts as the Uptown Project redeveloper, again subject to HUD approval. Barco learned of the transaction from newspaper reports and later obtained a copy of the proposed agreement, but it did not communicate with the Authority to assert its rights under the first refusal clause at that time.[6]

On October 11, 1976, the Authority published legal notices of its intent to execute a sale and redevelopment contract with Resorts, and the contract was signed on October 22. Resorts was not yet aware of the previous agreement with Barco. On November 2, 1976, the voters of New Jersey approved a resolution permitting casino gambling in Atlantic City.

On April 18, 1977—over five years after the termination of the contract and six months after the signing of the Resorts' contract—counsel for Barco wrote to the Authority and to Resorts asserting that the Authority had breached the first refusal provision of the 1969 agreement by executing a contract with Resorts without notice to Barco. On June 23, 1977, Barco filed this lawsuit seeking specific performance of its right of first refusal. The defendants filed counterclaims and Resorts International cross-claimed against the Authority.

### III.

At trial, and before us, Barco argues that the duration of its right of first refusal must be measured from the date of contract termination, when the right vested. Barco bases this contention on its view of the purpose of the clause: The parties intended the first refusal to protect Barco's interests in the event of an unreasonable termination by the Housing Authority, interests that can only be protected by measuring the duration of the right from the termination. The Housing Authority and Resorts rely on the district court's determination that regardless of when the termination occurred, the right of first refusal was never intended to extend beyond the five-year framework for conveyances under the agreement and HUD's conditional approval. The appellees bolster their position with the contention that a longer duration would have a "chilling effect" on negotiations with other redevelopers, thereby further delaying a project that had already consumed millions of dollars in public funds. They argue that Barco's interpretation of the contract thus would conflict both with HUD policies and the public objective of speedy urban renewal.

The district court viewed the issue not as a question of when the right of first refusal would *begin*, but as a question of when, at the latest, the right *terminated*.

The Authority-Barco contract itself provided that,

> The [Authority] shall deliver the deed and possession of each parcel of the Property to the Redeveloper in accordance with the Takedown Schedule, but *in any event within five years from the date hereof or on such earlier date as the parties hereto may mutually agree in writing* ... (Emphasis added)

Furthermore, the HUD approval of the April 1969 agreement stipulated that Barco must purchase all parcels compris-

---

**6.** The minutes of the July 20, 1976, meeting of the Board of Directors of Barco's parent, Bankers Securities Corporation, reveal that the subject was under active consideration:

> The Company [Barco] has taken the position that it is entitled to a right of first refusal in connection with any further development of the 80 acre urban renewal site in Atlantic City. The urban renewal authority has denied the Company's legal position, and *if*

*gambling in the City is approved by the electorate,* the company may seek to enforce its position in the Courts.

App. at 816e (emphasis added). After the referendum on gambling was approved, the minutes of the corporation's meeting on November 23, 1976, note that "some recoupment of [Barco's] losses is possible if it is deemed desirable to litigate. . . ." *Id.* at 824e.

ing the Uptown Renewal Project within 63 months.

District Court Op. at 29, app. at 1899. The court found that the right of first refusal could extend only to April 22, 1974; and because there was no contract with Resorts International until October 22, 1976, there was no breach. In the absence of a breach, the district court did not reach the issue of specific performance.[7] The district court also denied the counterclaims and Resorts' cross-claim. These appeals followed.

## IV.

When parties to a contract in a commercial setting fail to specify terms that are essential to a determination of their respective legal obligations, courts imply the omitted terms. *See Onderdonk v. Presbyterian Homes of New Jersey,* 85 N.J. 171, 182, 425 A.2d 1057, 1062 (1981); Restatement (Second) of Contracts § 204 (1981). Terms are implied not because

> they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them ... or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto.

*William Berland Realty Co. v. Hahne & Co.,* 26 N.J.Super. 477, 487, 98 A.2d 124, 129 (Ch.Div.1953), *modified,* 29 N.J.Super. 316,

102 A.2d 686 (App.Div.1954) (citations omitted). The time for performance is frequently unspecified by parties who have otherwise reduced their understandings to an enforcible, formal agreement, and courts uniformly infer in such circumstances that the parties intended performance to occur within a "reasonable time." Duration of a right of first refusal not expressly limited, the problem presented here, is analogous to determining the time for performance under a contract that is silent in that regard. The appellant contends, the district court held, and we agree, that in these circumstances the right of first refusal lasts for a commercially reasonable time.

Determination of what is a reasonable time requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy. Restatement (Second) of Contracts § 204, comment d (1981). Under New Jersey law

> Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded.

*Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 301, 96 A.2d 652, 656 (1953).

---

**7.** In ruling on Barco's post-judgment motion for a stay to prevent the conveyance of the property to Resorts International pending appeal, the district court considered whether Barco would be entitled to specific performance in the event this court reversed the decision on breach:

> [W]hile I found it unnecessary to consider directly the matter of specific performance, the opinion is replete with factual findings which would weigh heavily against Barco on the issue. One prominent example is Barco's delay in asserting its rights and its motivation in doing so, as reflected in the minutes of meetings of the Board of Directors of its parent company.

App. at 1917. Indeed, the district court observed that Barco's conduct "probably amounted to laches ..., at least as to Resorts." District court op. at 25 n.9, app. at 1885 n.9. Similarly, in view of the equitable principles applicable to specific performance, the requirement that the right to it be established by clear and convincing evidence, and that it is in large part discretionary, we would be hard pressed to find the denial of specific performance in these circumstances to be erroneous. *See Schiff v. Schiff,* 116 N.J.Super. 546, 283 A.2d 131 (App.Div.1971), *certif. denied,* 60 N.J. 139, 286 A.2d 512 (1972); *Hollister v. Fiedler,* 30 N.J.Super. 203, 104 A.2d 61 (App.Div.1954), *modified on other grounds,* 17 N.J. 239, 111 A.2d 57 (1955).

**1008**

Although interpretation of a writing is generally a question of law for the court,[8] when extrinsic evidence is introduced in aid of its interpretation or to imply a missing term, as was the case here, the question becomes one of fact—the intent of the parties—to be resolved by the fact finder unless the evidence and resulting inferences are uncontroverted.[9] What is reasonable "is ordinarily a subject on which opinions will differ, and so it is a question of fact. What constitutes a 'reasonable time'" under New Jersey law "is usually an implication of fact, and not of law, derivable from the language used by the parties considered in the context of the subject matter and the attendant circumstances, in aid of the apparent intention." *West Caldwell v. Caldwell*, 26 N.J. 9, 28, 138 A.2d 402, 412 (1958).[10] When tried non-jury, we review basic and inferred facts found by the trial judge under the clearly erroneous rule, Fed. R.Civ.P. 52(a); *see Universal Minerals v. C.A. Hughes & Co.*, 669 F.2d 98 (3d Cir., 1981), in accordance with the test set forth in *Krasnov v. Dinan*, 465 F.2d 1298, 1302-03 (3d Cir. 1972).

## V.

We now evaluate the contentions of the parties against these precepts. The parties agree that the duration of Barco's right of first refusal is not expressly set forth in the agreement and therefore that it extended for a commercially reasonable time following the termination under section 8(a). Barco argues that its right should be calculated from the date the agreement was terminated, and that this was the intent of the parties as expressed by Mr. Amsterdam and the drafter of the contract, attorney Helen Chait. Barco argues also that as a pre-emptive right the right of first refusal could not come into being until the agreement was terminated. We agree with both contentions, but that does not end our inquiry. We also must determine whether the 63-month HUD limitation and the five year limitation on conveyance in the contract itself, together with the remainder of the contract and relevant circumstantial evidence, permitted the court to infer that the right of first refusal could extend only to April 22, 1974.

■ Barco contends that it was improper for the district court to look to other provisions of the contract to interpret the right of first refusal provision. As an independent covenant, Barco argues, the right of first refusal provision was severable from the basic agreement and thus endured beyond its term. We reject this argument. As we have noted, the polestar of contract interpretation is to ascertain "the intentions and understanding of the two parties." *Atlantic Northern Airlines*, 12 N.J. at 301, 96 A.2d at 656; *see also* 3 A. Corbin, Contracts § 542 (1960). All other tools in aid of interpretation are subordinate to this goal. *Kearny PBA Local # 21 v. Kearny*, 81 N.J. 208, 221-22, 405 A.2d 393, 400 (1979). By intention, courts do not mean the actual subjective intention of the parties, but the objective manifestations of intent. *See Leitner v. Braen*, 51 N.J.Super. 31, 38, 143

**8.** *See Jersey Central Power & Light Co. v. Local Unions*, 508 F.2d 687, 700 n.37 (3d Cir. 1975) (applying federal law to undisputed facts), *vacated on other grounds*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976); *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 773 (3d Cir. 1972) (interpretation rested only "on the literal words of the [contract]."). *See generally* J. Calamari & J. Perillo, Contracts 124 & n.47 (2d ed. 1977).

**9.** *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir. 1979) (in banc); *Michaels v. Brookchester, Inc.*, 26 N.J. 379, 387, 140 A.2d 199, 204 (1958). *See generally* 3 S. Williston, Contracts § 616 (3d ed. 1961). *Cf. Universal Minerals v. C. A. Hughes*

*& Co.*, 669 F.2d 98, 104 (3d Cir., 1981), ("the inference drawn as to intent is a statement of fact and not a holding of law").

**10.** Pennsylvania also views reasonableness as a question of fact. Dean W. Edward Sell of the University of Pittsburgh Law School has noted:

[T]he question of what is a reasonable time, under the Commercial Code as under the Sales Act, will be a question of fact for the jury unless but one inference can be drawn therefrom as to reasonableness.

Sell, Sales, 1956-1957 Survey of Pa. Law, 19 U. of Pitt.L.Rev. 306 (1958), *quoted in Pritchard v. Liggett and Myers Tobacco Co.*, 295 F.2d 292, 298 n.15 (3d Cir. 1961).

A.2d 256, 260 (App.Div.1958).[11] Because other terms of the same agreement are among the most objective indications of the parties' intentions with regard to the missing term, it was not only proper but absolutely necessary for the district court to look to the whole agreement. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2) (1981). A corollary to the principle that a writing is interpreted as a whole is that an ambiguous subsidiary contractual provision must be given an interpretation consistent with the dominant purpose of the contract. *See Krosnowski v. Krosnowski*, 22 N.J. 376, 126 A.2d 182, 188 (1956).[12]

The five year limitation on conveyance, the district court concluded, supported its inferred factual conclusion that the parties did not intend the right of first refusal to survive that limitation.

The court had little difficulty in concluding that the essential purpose of the contract was to achieve redevelopment of the parcel at the earliest possible date. In attempting to discern the dominant purpose of the contract, the district court relied on HUD policies that prohibited redevelopers from speculating in subsidized redevelopment land by holding it without building "in order to benefit by increments in value

that result solely from redevelopment performed by others and from general market conditions." District court op. at 29, app. at 1899. Moreover, recognizing both the public objective of rapid urban renewal, *see* 42 U.S.C. § 1460, and the enormous expenditure of public funds on the projects already, the court was convinced that the contract "must be construed favorably to that interest." District court op. at 30–31, app. at 1900–1901.

The court then examined the effect of the right of first refusal on that purpose. It gave credence to Mrs. Hill's testimony that its existence produced a "chilling effect" deterring potential redevelopers. Without reference to the five year limitation on conveyance, she testified that a commercially reasonable time for the exercise of the right would be no more than two years from the date of termination because of the cloud this right put on the title.[13] As the court found, "a developer would undoubtedly be extremely cautious about expending a great deal of time, effort and money on devising an agreement acceptable to the Authority if it knew the work might be forfeited." *Id.* at 29, app. at 1899. Even Amsterdam admitted that the right of first refusal could have that chilling effect. App. at 484.

Barco attempts to show the "illogic" of the district court's interpretation by posing

---

11. *Cf.* Holmes, *The Path of the Law*, 10 Harv.L. Rev. 457, 463–64 (1897):

[N]othing is more certain than that parties may be bound by a contract to things which neither of them intended, and when one does not know of the other's assent. Suppose a contract is executed in due form and in writing to deliver a lecture, mentioning no time. One of the parties thinks that the promise will be construed to mean at once, within a week. The other thinks that it means when he is ready. The court says that it means within a reasonable time. The parties are bound by the contract as it is interpreted by the court, yet neither of them meant what the court declares that they have said. In my opinion no one will understand the true theory of contract or be able even to discuss some fundamental questions intelligently until he has understood that all contracts are *formal*, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two

sets of external signs,—not on the parties' having *meant* the same thing but on their having *said* the same thing.

12. A subsidiary provision should be "so interpreted as not to be in conflict with what clearly appears to be the 'dominant purpose' of the contract"; where the "principal purpose" of the parties is fairly discernible, "further interpretation of the words of the contract should be such as to attain that purpose, if reasonably possible".... *Krosnowski v. Krosnowski*, 22 N.J. at 387, 126 A.2d at 188 (citations omitted). Ascertaining the dominant purpose of a contract is simply another tool to aid in finding the intent of the parties, and therefore we reject Barco's suggestion that *Kearny* overruled *Krosnowski*.

13. Amsterdam testified that in his opinion five, six, seven, or ten years after termination would be a reasonable time.

three hypotheticals. Two assume offers that the Authority would be prepared to accept on either April 21, 1974 or April 23, 1974, thereby giving Barco either 24 hours or no time at all to exercise its right of first refusal. While facially appealing, these hypotheticals ignore the predicate for unilateral termination under section 8: failure to reach a supplemental agreement within a reasonable time after April 22, 1969. How long that period was intended to last was not a question presented to the district court, but in view of the five year limitation on conveyance, it would necessarily be considerably shorter than five years. Indeed, all indications were that the parties anticipated an early settlement on the supplemental agreement, pending modification of the urban renewal plan. Barco and the Authority chose to proceed at once with the agreement, however, so that work could begin on the Beachgate property. We think it highly unlikely that the situations suggested by the hypotheticals would have occurred to the parties at the time the contract was drafted or that the clause was intended to operate in such extremes. The emphasis throughout the contract was on early agreement and construction on the entire project.

Nor do we find compelling Barco's hypothetical assuming an offer that the Authority would be prepared to accept on April 22, 1973, providing for phased conveyance of parcels over several years. Barco contends that under the district court's interpretation, Barco would not have the power to accept such a proposal. Although the five year limitation on conveyance may be construed to limit also the duration of the right of first refusal, neither the contract nor the district court suggested that it would so limit the terms of a subsequent agreement entered upon the timely exercise of Barco's preemptive right. The agreement plainly provides that Barco had the power to offer to perform the work "on the same terms" as offered by a third party.

Although we recognize that a different inference of the intent of the parties could be drawn, we cannot conclude that the findings were clearly erroneous. We accept both the legal and factual analysis of the district court.

Moreover, even if we indulged the appellants and reviewed the question as one of law, we would reach the same result. We agree with the district court that the design of the contract was to promote the expeditious development of the tract, a fact reflected in its overall tenor. Amsterdam and Hoffman, sophisticated redevelopment entrepreneurs who also held positions of responsibility on the Philadelphia Redevelopment Authority, were not ignorant of this objective. As proponents of the right of first refusal clause and drafters of the contract, Barco could have structured the agreement to extend unambiguously its preemptive privilege beyond the deadline for conveyance. It failed to do so. In construing the provision we are guided by the precept that among reasonable meanings, the one which operates against the draftsman is to be preferred. *Terminal Construction Corp. v. Bergen County Hackensack River Sanitary Sewer District Authority,* 18 N.J. 294, 302, 113 A.2d 787, 791 (1955); Restatement (Second) of Contracts § 206 (1981). In view of the overall objective of the contract revealed by its terms, it was reasonable to conclude that the deadline for conveyance also terminated any outstanding right of first refusal. If we considered the matter as a question of law, therefore, we would also hold that the right of first refusal expired.

We have considered other contentions of the parties concerning the issue of what constitutes a reasonable time and conclude that they are without merit. We also reject the Authority's and Resorts' argument that the termination was for default and never gave Barco a right of first refusal. The district court, while recognizing that the argument was tenable, noted that the Authority never treated the termination as one for default, and expressed doubt about whether a default could have been established on the facts. We agree.

Whether viewed from the standpoint that the court's finding of reasonable time was a

question of fact for the fact finder or that it was a question of law, we will not disturb the determination of the district court. Accordingly, we will affirm its judgment.

### VI.

Cross appeals have been lodged challenging the dismissal of counterclaims for tortious interference, malicious prosecution, and abuse of process. Resorts alleged that Barco sued it maliciously and without cause and thus thwarted development of the project for many years. The district court explained that a claim of tortious interference under New Jersey law " 'requires [the fact finder] to consider whether the defendant's conduct was both injurious and transgressive of generally accepted standards of common morality or of law.' *Inventive Music Ltd. v. Cohen*, 617 F.2d 29, 34 (3d Cir. 1980) (citation omitted)." District court op. at 32, app. at 1902. The court found that "Barco did not transgress commonly accepted standards of morality or of law." *Id.* at 35, app. at 1905. We will not disturb this determination.

Judge Thompson dismissed the counterclaim for malicious prosecution because New Jersey requires favorable termination of the underlying action prior to the bringing of suit. *See The Penwag Property Co. v. Landau*, 76 N.J. 595, 598, 388 A.2d 1265, 1266 (1978). Resorts acknowledges that "the legal authority cited by the District Court supports its ruling," but argues that it should not be applied here because Barco is not a "David" likely to be intimidated by a counterclaim filed by a "Goliath" alleging malicious prosecution. The Housing Authority adopts the same arguments regarding its counterclaim for abuse of process. We find no reversible error.

### VII.

The judgment of the district court will be affirmed in all respects.