**SUN COMPANY, INC. and Sun Exploration and Production Company, Plaintiffs,**

v.

**The UNITED STATES of America, The United States Department of Energy, Donald Hodel, James A. Martin, Fred C. Howell, Jr., and Carl A. Corrallo, Defendants.**

**Civ. A. No. 83–204–WKS.**

United States District Court, D. Delaware.

Oct. 3, 1984.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., James Baller, Mary Ann Hammett, Baller & Hammett, Washington, D.C., C.L. Carpenter, Charles L. Spann, Dallas, Tex., for plaintiffs.

Joseph J. Farnan, Jr., U.S. Atty., Sue L. Robinson, Asst. U.S. Atty., Wilmington,

---

Del., Larry P. Ellsworth, David A. Engels, Arthur S. Weissbrodt, U.S. Dept. of Energy, Washington, D.C., for defendants.

## OPINION

STAPLETON, Chief Judge:

Plaintiff, Sun Company, Inc. and its wholly owned subsidiary, Sun Exploration and Production Company (collectively "Sun"), brought this civil action against the United States of America, Department of Energy ("DOE") and certain DOE officials seeking enforcement of a settlement agreement embodied in a Consent Order entered by the Agency on September 11, 1980 ("the Consent Order"). Sun alleges that DOE has repeatedly violated the agreement and, accordingly, seeks declaratory relief, injunctive relief and money damages.

This action is currently before the Court on Sun's motion for summary judgment. Sun claims that the language of the Consent Order at issue is clear and unambiguous, that the DOE is pursuing a course of action that clearly violates the plain meaning of the Consent Order, and that, therefore, Sun is entitled to summary judgment as a matter of law.

## I

In 1973, the DOE imposed price controls on the "first sale" of crude oil produced within the United States. While the sellers in a "first sale" are ordinarily the working interest or royalty owners, it is normally the operator of a particular producing property who controls the day-to-day operations of the property and makes the various pricing and other decisions which are important under the DOE's price regulations. Because of the operator's unique position, the DOE has a policy of proceeding against an operator to satisfy *all* alleged overcharges on sales of oil from a given property, instead of proceeding against the often numerous other companies that hold working or royalty interests in, but do not operate, the property in question. By proceeding against the operator for one hundred percent of the alleged overcharges, the DOE can effectively recover for all pricing violations at a given property in a single enforcement action and avoid the heavy burden of multiple enforcement actions against each individual interest owner.

The DOE's adjudicatory bodies have consistently ruled that the DOE may recover all overcharges from the operator of a property. *E.g., Braden-Zenith, Inc.,* 5 FEC ¶ 80,522 (1977); *Sun Company, Inc.,* 11 DOE ¶ 82,531 (1983). The operator liability doctrine has also received approval from the federal judiciary. *E.g., Sauder v. DOE,* 648 F.2d 1341, 1347–48 (TECA 1981); *United States v. Exxon Corp.,* 561 F.Supp. 816, 849–50 (D.D.C.1983).

In addition to owning interests in property that it operates, Sun owns working and royalty interests in numerous properties operated by other firms. The DOE has brought enforcement actions against several operators of properties in which Sun has working or royalty interests. In these enforcement actions, the DOE has, consistent with the operator liability doctrine, sought to recover all alleged overcharges stemming from the properties in question, including alleged overcharges attributable to the oil that Sun owned in its capacity as a working or royalty interest owner.

As stated in its "Introduction," the purpose of the Consent Order entered into between Sun and the DOE was to "settle and ... finally resolve ... all civil claims, whether or not heretofore asserted, against Sun by DOE arising out of Sun's compliance with the federal petroleum price and allocation regulations administered and enforced by DOE for the period March 6, 1973, through June 30, 1980." Sun and the DOE are in agreement that the Consent Order, subject to several explicit exceptions, bars the DOE from bringing claims against Sun on Sun's capacity *both* as an interest owner in properties that Sun itself operates, *and* as an interest owner in properties operated by others.

At issue here is Sun's contention that the plain and unambiguous language of the Consent Order *also* prohibits the DOE from asserting claims against third party

operators for alleged overcharges attributable to Sun's working or royalty interests. Accordingly, Sun argues that the DOE's claims against operators must be reduced by any amount attributable to Sun's interest in the property in question.

Sun argues that in ruling upon its motion for summary judgment the Consent Order must be construed as written without resort to any extrinsic evidence. The DOE offers a different interpretation of the disputed language of the Consent Order and urges this Court to consider extrinsic evidence in determining the intent of the parties.

## II

As the Supreme Court explained in *Armour United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971), the scope of a Consent Order must be construed as written:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

As our Court of Appeals recently explained in *Fox v. United States*, 680 F.2d 315, 319–20 (3d Cir.1982), these teachings from the *Armour* case leave room for the

consideration of extrinsic evidence when the Consent Order is ambiguous:

> The "four corners" rule of *Armour* is consistent with the ordinary principle of contract construction that resort to extrinsic evidence is permissible only when the instrument itself is ambiguous, although frequently the circumstances surrounding its formation will be relevant to its meaning. "Such reliance does not in any way depart from the 'four corners' rule of *Armour*." *ITT Continental Baking*, 420 U.S. [223] at 238, 95 S.Ct. [926] at 935 [43 L.Ed.2d 148 (1975) ].

> Interpretation of a contract is ordinarily a question of law for the courts. But when the contract is ambiguous, extrinsic evidence may be required to discern its meaning, transforming the question into one of fact to be resolved by the fact finder, except where the evidence and resulting inferences are uncontroverted. *Barco Urban Renewal Corp. v. Housing Authority*, 674 F.2d 1001, 1007–08 (3d Cir.1982). Whether a contract or consent decree requires extrinsic evidence in aid of interpretation is, of course, itself a question of interpretation subject to plenary review. The first task, therefore, is to determine whether the instrument by its terms unambiguously covers the dispute. The relevant search, as in contract interpretation, is not for the subjective intention of the parties "but what [their] words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used." The rule employed to reach this result is that language must be interpreted in accordance with its generally prevailing meaning unless the parties manifest a different intention or the words are technical....

The task before this Court, therefore, is to determine whether the Consent Order unambiguously resolves the dispute between the parties. *Fox*, 680 F.2d at 320. I conclude that it does not and that the entry of a summary judgment would be premature.

## III

Sun's interpretation of the Consent Order is based on paragraphs 506 and 508. Paragraph 506 provides in pertinent part that, "All pending and potential claims ... [and] causes of action ... regarding Sun's compliance with ... [DOE] regulations during the period covered by the Consent Order ... are resolved and extinguished by this Consent Order...." Sun argues that since paragraph 506 extinguishes "*all* ... claims regarding Sun's compliance" with DOE regulations, it follows that *all* claims assertable by DOE, whether against Sun or another party, for overcharges attributable to Sun's interests are foreclosed.

Sun puts forth a similar argument with respect to the portion of paragraph 508 in which the "DOE release[d] completely and for all purposes all ... claims ... [and] causes of action ... that it has asserted and may be able to assert ... against Sun arising out of any ... [DOE] regulations.[1] Since, as previously pointed out, the DOE may proceed either against the operator of a given property or against the individual interest owners in order to recover overcharges, Sun argues that a claim against an operator for overcharges stemming from a property in which Sun owns an interest is a claim which the DOE would "be able to assert ... against Sun" and, accordingly, is released under paragraph 508.

Finally, Sun relies on a further provision in paragraph 508. After the provision quoted in the preceding paragraph and a commitment by DOE not to initiate or prosecute a proceeding on the released claims, the DOE also promised "not [to] voluntarily participate adversely to Sun in any ... proceeding related to Sun's compliance with ... [DOE] regulations ... or otherwise take action with respect to Sun in derogation of this Consent Order." Sun maintains that actions against third party operators involving Sun interests are "adverse" to Sun because of their potential for spawning contribution suits against Sun and also arise out of "Sun's compliance" with the DOE regulations.

While Sun's interpretation of the relevant language of the settlement agreement may be a reasonable one, Sun has not persuaded me that the agreement is unambiguous. Paragraphs 506 and 508 must be read in their entirety, in the context of the agreement as a whole, and in light of the legal rules which provided the backdrop for the agreement. When so read, it cannot be said that the agreement is unambiguous on the issue that now separates the parties.

Contrary to Sun's interpretation, the Consent Order can be interpreted in a more limited manner. The Introduction can be read to define the scope of the entire agreement and to limit the application of the ensuing provision solely to proceedings by DOE against Sun arising out of Sun's com-

---

1. Section 508 reads in its entirety as follows:

508. Except as explicitly excluded herein, in consideration for performance under this Consent Order by Sun, DOE hereby releases completely and for all purposes all administrative and civil judicial claims, demands, liabilities, causes of action and other proceedings, specifically including claims for civil penalties and including the Subpoena issued to Sun on December 13, 1977, as superseded by the Subpoena Agreement dated November 28, 1978, that it has asserted and may be able to assert before or after the date of this Consent Order, against Sun arising out of any of the federal petroleum price or allocation regulations for the period covered by this Consent Order. DOE will not initiate or prosecute any such civil matter or cause or refer any such matter to be initiated or prosecuted, nor will Special Counsel, or its successor, directly or indirectly aid in the initiation or prosecution of any such civil matter. DOE will not voluntarily participate adversely to Sun in any administrative or civil judicial proceeding related to Sun's compliance with the federal petroleum price and allocation regulations for the period covered by this Consent Order, or otherwise take action with respect to Sun in derogation of this Consent Order. Based on the information and evidence presently in its possession, DOE expressly agrees that it will not seek any criminal fines or penalties for the period covered by this Consent Order. Nothing contained herein may be construed as a bar, an estoppel, or a defense against any criminal action, or against any civil action brought by an instrumentality or agency of the United States other than DOE under any statute or regulation other than the federal petroleum price and allocation regulations.

pliance with the DOE regulations. It provides:

> This Consent Order is entered into between Sun Company, Inc., and the United States Department of Energy. Except as explicitly excluded herein, it settles and finally resolves all civil claims, whether or not heretofore asserted, against Sun by DOE arising out of Sun's compliance with the federal petroleum price and allocation regulations administered and enforced by DOE for the period March 6, 1973, through June 30, 1980 ("the period covered by this Consent Order").

As the DOE stresses, this seminal provision of the Consent Order is thus restricted to "civil claims ... against Sun by DOE" and arguably excludes claims by DOE against operators.

Similarly, paragraph 508 itself contains a reference to "claims ... against Sun" which can be viewed as excluding DOE claims against operators. Moreover, paragraph 509, in which the DOE commits itself to terminate pending administrative and judicial proceedings contemplates the withdrawal of only proceedings "against Sun."

The portions of paragraphs 506 and 508 relied upon by Sun are not necessarily inconsistent with this restricted reading of the Consent Order. While Sun argues that the reference in 506 to "all ... claims regarding Sun's compliance" must be construed to cover claims against operators with respect to Sun's working interests, a reference of this kind should normally be read in the context of the regulatory law which existed at the time the Consent Order was entered. In April of 1981, some six months before the date of the Consent Order, the Temporary Emergency Court of Appeals held an operator of a property owned in part by others liable for the full amount of overcharges under Section 209 of the Act because "it was he who caused the overcharges." *Sauder v. Department of Energy*, 648 F.2d 1341, 1347 (TECA 1981). Moreover, at that time, the pricing regulations included an operator within the definition of a "producer" and provided

that no producer may charge a price higher than permitted under those regulations. 10 C.F.R. §§ 212.31 and 212.73, *et seq.* (1981). Given this contemporary law, one can argue with some force that the claims which Sun here asserts are unambiguously included in the settlement as "claims regarding Sun's compliance" are, in fact, claims regarding the operator's compliance and are, therefore, excluded.

Similarly, since claims against an operator can be predicated on the operator's breach of his own legal duty, it is not necessary to view them as claims which the DOE might have brought against Sun for purposes of paragraph 508.

With respect to the DOE's commitment not to voluntarily participate adversely to Sun in any proceedings related to its compliance with the price regulation, I agree that this section of the agreement seems to encompass proceedings other than ones brought by the DOE against Sun. It is not necessary, however, to read this commitment as referring to proceedings initiated by the DOE against operators of properties in which Sun has an interest. The parties may well have been thinking of potential DOE assistance to a third party that is bringing an action against Sun for alleged violations of the regulations.

Finally, one further argument of Sun's needs to be addressed. Sun argues that viewing the Consent Order merely as a limited covenant only prohibiting the DOE from actions against Sun, would permit the DOE to obtain a double recovery of overcharges attributable to Sun's working or royalty interests in properties that it does not operate—a result that is, according to Sun, violative of the so-called "one recovery principle." This principle—that only one recovery may be obtained from an overcharge arising from a violation of DOE regulations—is "well-settled", *Sun Company, Inc.*, 10 DOE ¶ 82,542 at 85,237, 10 DOE, and the DOE in the present case does not dispute the validity of the doctrine. According to Sun, the parties to the Consent Order clearly must have intended a settlement which would not result in a vio-

lation of this well established principle rather than a settlement which would violate it.

There is not as much power in this argument as Sun suggests. When the parties negotiated the Consent Order there was no way of knowing whether a decision to limit the settlement to claims against Sun would or would not result in a violation of the double recovery principle. If the parties intended that DOE would remain free to pursue operators for the full amount of any overcharges, it does not follow that they expected double recovery. Being free to assert a claim and recovering on it are two different things. In the normal course of events, the double recovery principle is something one would expect to be raised by way of defense in any DOE proceeding against an operator and, based on the general law in 1981 pertaining to the effect of a settlement with one of two joint obligors, one might have supposed that this defense would have found a sympathetic ear. Even when the party giving a release does not intend to release a nonsettling joint obligor, the principle of double recovery normally requires that either the amount paid in settlement by a settling joint obligor or his pro-rata share of the claim be deducted from any subsequent judgment against the non-settling joint obligor.[2] *See, e.g., Zenith v. Hazeltine Corporation,* 401 U.S. 321, 342–348, 91 S.Ct. 795, 808–811, 28 L.Ed.2d 77 (1971). While subsequent events have now caused Sun to doubt that operators will be universally successful with a double recovery defense, this present concern is not of great assistance in drawing conclusions about the intent of the parties in 1981.

This is not to say that the possibility of double recovery is not an appropriate fact to be considered in construing the Consent Order. That possibility, as well as the possibility of contribution suits against Sun, are part of the context in which the parties negotiated the Consent Order. But these

possibilities do not compel a construction of the text of the order which precludes suits by the DOE against third party operators. The agreement is ambiguous on that issue and it is, accordingly, appropriate to consider extrinsic evidence as the DOE suggests.

---

**2.** To the extent that the double recovery rule might be held to insulate operators, it would also serve to insulate Sun against contribution claims. The law with respect to whether an operator, paying more than its ownership share of an overcharge, had a claim for contribution was unsettled in 1981 and remains in that state.