**VANGUARD TELECOMMUNICATIONS, INC., Appellant,**

v.

**SOUTHERN NEW ENGLAND TELEPHONE COMPANY; CSX Corporation, and Lightnet.**

No. 89–5550.

United States Court of Appeals, Third Circuit.

Argued Dec. 11, 1989.

Decided March 30, 1990.

Rehearing and Rehearing En Banc Denied May 23, 1990.

---

John G. Jacobs (argued), Jonah Orlofsky, Susan R. Haerr, Plotkin & Jacobs, Ltd., Chicago, Ill., Gerald T. Ford, Siff, Rosen & Parker, Newark, N.J., for appellant.

Jack Lipson (argued), Steven G. Reade, Michele J. Brace, Arnold & Porter, Washington, D.C., Matthew P. Boylan, Lee Hilles Wertheim, Lowenstein, Sandler, Kohn, Fisher & Boylan, Roseland, N.J., for appellees.

Before HUTCHINSON, COWEN, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The appeal in this diversity case from the trial court's grant of summary judgment presents primarily a question of contract construction. Plaintiff, Vanguard Telecommunications (Vanguard), sued defendants, Southern New England Telephone (SNET), CSX Corporation (CSX), and their joint venture Lightnet (referred to collectively as Lightnet) for an alleged breach of their brokerage contract. Vanguard claimed that it was due commissions on all sales made to companies on its prepared account list, regardless of who was responsible for the sale. Vanguard also made a claim for breach of fiduciary duty and attempted to amend its complaint to add a claim for fraud. The trial court granted summary judgment on the breach of contract and fiduciary duty claims. 722 F.Supp. 1166. The court denied Vanguard leave to amend to add a cause of action for fraud, ruling that the contract, as a matter of law, did not grant Vanguard a right to commission on sales made by Lightnet itself. Vanguard appeals. We affirm.

### I.

In April 1983 CSX and SNET publicly announced their intention to form a joint venture to study the market potential for a fiber optic telecommunications network in the eastern part of the United States along CSX owned railroad rights of way and to market fiber optic systems to large volume users of long distance telecommunications capacity. Four months later the parties announced the formation of Lighnet as a going entity to market their fiber optic systems. Lightnet immediately engaged Robert E. LaBlanc & Associates (LaBlanc), a prestigious telecommunications consulting firm, as its primary marketing consultants. Soon after the public announcement of the formation of Lightnet, Vanguard called on it to offer to broker Lightnet's fiber optic systems.

Vanguard, which billed itself as a communications consulting firm as well, was also a relatively young but diminutive enterprise when it approached Lightnet. It had been founded by Donald Van Doren and Jim Rice and had no previous experience in selling telecommunications capacity. Rice, however, had most recently been employed with Allnet Communications Services (Allnet). Vanguard also worked closely with Carroll Bowen, a telecommunications consultant, and his company.

Vanguard approached Lightnet, directly and through LaBlanc, representing that it was uniquely positioned to market Lightnet to "reseller" firms of the telecommunications industry which Lightnet otherwise had overlooked or would be unable to reach. "Resellers" purchase capacity in bulk and resell it in smaller quantities. Significantly, Vanguard identified Lightnet as a "target of opportunity."

Vanguard's principals met several times with Lightnet and LaBlanc personnel to discuss a potential marketing agreement. Rice and Bowen reached a *preliminary* understanding with Richard Wolf of LaBlanc at a meeting on October 20, 1983, by which Vanguard would market Lightnet optic capacity to companies on an account list and would receive commission of two percent on any sales that Vanguard brought to Lightnet. At the conclusion of the meeting Wolf of LaBlanc gave Rice a letter which stated, "This letter will intro-

duce Vanguard Telecommunications Inc. who has been retained as a representative by Lightnet to act in their behalf in marketing Lightnet." The letter made no statement of the terms of the retainer.

Vanguard interpreted this preliminary arrangement as granting it a right to a commission on any sale of Lightnet to any company on the account list, regardless of who was actually responsible for the sale. It contends that this method of distributing commissions was adopted to avoid "beauty contests," in which Vanguard and Lightnet might quibble over who had caused specific sales, preventing the two from efficiently working together. Wolf concedes that this potential problem was discussed, but denies that Vanguard was given a right to commission on all sales, regardless of its level of responsibility in producing the sale.

Following this meeting, Vanguard commenced activities to market Lightnet optical capacity. It made initial contacts with most of the companies on its account list, and even sent a preliminary proposal to Allnet. The parties also continued to negotiate a final agreement, exchanging several draft "Agreements in Principle," which calculated commissions applying a complex formula including variables related to the volume and timing of sales to account list companies.

On December 29, Van Doren met with Lightnet Marketing Managers Dennis Evans and Gerald Clement, and President Frank Wollensack to try and hammer out a final written agreement. At this meeting, the parties spoke extensively about Lightnet's relationship with Vanguard, including the issue of avoiding "beauty contests." Van Doren contends that the parties agreed to the "Account List" concept, compensating Vanguard for all sales to potential customers on the list, regardless of its level of sales responsibility. The Lightnet representatives disagree that the "Account List" concept was adopted, though they admit that it was discussed. Ultimately, however, no final agreement was reached at this meeting.

On January 13, Evans and Van Doren had a phone conversation in which they decided that the agreement should provide for a straight two percent commission, without any complicated formula. Evans also agreed to reimburse Vanguard for all expenses it had already incurred on Lightnet's behalf. Finally, they agreed to meet later that week to iron out the terms of the agreement, which Evans would subsequently memorialize in writing. Van Doren contends, and Evans denies, that they also agreed to apply the Account List concept of determining when Vanguard was due a commission.

At the meeting later in the week, the parties reached a final agreement, which was memorialized in a letter dated January 27, 1984, from Evans to Van Doren (the Evans letter). The letter reads in its relevant parts:

> This will serve to confirm our acceptance of the proposed remuneration [sic] figures we discussed Thursday, January 19th, for the past efforts of Vanguard.
>
> .    .    .    .    .
>
> In addition, Vanguard Telecommunications, Inc. will be compensated with a 2% commission on the amount of the sale price for LIGHTNET fibers or bandwidth sold to any customer on their "Account List" (attached), provided the sale is contracted for within twenty-four months beginning February 1, 1984.
>
> We also agreed that LIGHTNET takes over sales responsibility for all accounts on the Account List. This means Vanguard will not represent LIGHTNET from now on, except as mutually agreed upon in advance for customers on the Account List. For example, we'll mutually agree on your role/our role with ALLNET following our planned joint meeting with the customer. The other accounts will be reviewed with you and we'll decide where a dual customer visit is appropriate, where Vanguard should telephone the customer to explain the change in account handling, or where we should work with you on the sale for some time.
>
> My assumption, although we didn't discuss it specifically, would be that Vanguard would, in the future, be compen-

sated as in the first paragraph for time or out of pocket expenses when we called upon you for account support for customers on the Account List.

Rice sent a confirmatory letter (the Rice letter) agreeing to these terms:

As we discussed, we think the terms of our agreement outlined in your letter to Don Van Doren dated January 27, 1984, are acceptable.

This letter summarizes the clarifications to that letter which Don and I discussed on the phone with you as I understand them.

We agreed that the attached "Account List" should be revised as follows:

US Telephone includes United Telecommunications

Allstate Communications included Sears Communications

The 2% commissions owed on contract signing shall apply to the contracted amount of a lease (if Lightnet chooses to implement this approach) as well as the contracted amount of the sale.

The commission will be payable on a schedule which is being reviewed. Our current thinking on this is:

50% upon contract signing

25% upon construction initiation

15% upon construction completion

10% upon turn-up

We would like to move more of the commission to the contract signing point since our involvement will typically terminate at that point.

. . . . .

Dennis, I think this sets forth the content of our discussion. Please contact me if we have misunderstood something.

Lightnet asserts that the key to the agreement was its assuming control of all accounts. It had become disenchanted with Vanguard's inability to produce a single sale and concluded that Vanguard was not as well placed in the industry as it had originally thought. According to Lightnet, Vanguard had been making "cold" calls to prospective clients, and had failed to produce any business at all. Vanguard contends that it was only willing to give up control of the accounts because of the security the "Account List" concept gave it.

After the agreement was reached, Lightnet sold fiber-optic capacity to United Telecommunications (United) for an amount in excess of $115,000,000 and leased capacity to Americall LDC, Inc., (Americall) for over $1,000,000. Both United and Americall were indisputably on Vanguard's Account List. Lightnet refused to pay commissions to Vanguard on these transactions, although they did offer Vanguard $25,000 to remove United from the Account List. Vanguard's claim for two percent commission on these sales forms the core of its underlying complaint filed in the United States District Court for the District of New Jersey. Vanguard also requested punitive damages and brought a claim for breach of fiduciary duty. Finally, at trial, it requested leave to amend to add a claim for fraud.

The trial court granted summary judgment for Lightnet on both the breach of contract claim and the breach of fiduciary duty claim. It determined that there was not a "clear and unambiguous" expression granting Vanguard a right to commission for sales made by Lightnet to companies on the Account List, see *Holiday Homes of St. John, Inc. v. Lockhart*, 678 F.2d 1176 (3d Cir.1982) (applying Virgin Islands law), and thus held as a matter of law, the contract did not give Vanguard a right to a commission unless it "caused" the sale. It also held that Vanguard was not the legal cause of the sale to United or the lease to Americall. Further, the court granted summary judgment on the fiduciary duty claim, ruling that Lightnet owed no fiduciary obligation to Vanguard, and denied leave to amend the complaint, holding that New Jersey law did not recognize a claim for fraud in a commercial contractual claim and that even if it did, summary judgment would be proper.

Vanguard appeals, contending that the contract granted it a right to a commission, regardless of who actually made the sale. In the alternative, it claims that it was the legal cause of the United and Americall transactions. It also contends that the tri-

al court erred in not recognizing Vanguard's claims for fraud and breach of fiduciary duty.

## II.

### A.

Applying New Jersey law,[1] matters of contractual construction are generally a question of law. *Dome Petroleum, Ltd. v. Employers Mut. Liab. Ins. Co.*, 767 F.2d 43, 47 (3d Cir.1985). The questions involved in this case are concerned "with the legal operation of the agreement," because we, and the trial court before us, are not called upon to fill a gap in the agreement, but only to determine the legal effect of the agreement. *Cooper Laboratories v. International Surplus Lines Ins. Co.*, 802 F.2d 667, 671–72 (3d Cir.1986). Thus, our review is plenary, and we must determine from the words of the agreement its legal effect.

The first important issue facing us in construing the agreement is how to characterize it. Is it an oral or a written contract? If the agreement is oral, as asserted by the plaintiff, we will be unable to construe it until we can determine what are its terms. This task is best left to a full trial and determination by the jury. If the agreement is written, we need only determine the legally operative meaning of the written words. There is no need to ascertain what words were uttered, by whom, and at what time, because the written memorialization usually serves as a complete and accurate record.

In this case, despite the allegations of the plaintiff that it reached an oral agreement with the defendants at a meeting on January 19, 1984,[2] we conclude that the agreement is essentially written, formed by the letter of January 27, 1984, from Evans to Van Doren and the confirmatory letter from Rice to Evans. Under New Jersey law, if there is a "common intent to make the particular writing the exclusive memorial of the parties' contractual undertakings ... the writing [is] indisputable as regards the terms of the contract." *Marcus & Co. v. K.L.G. Baking Co.*, 122 N.J.L. 202, 3 A.2d 627, 630 (1939). In the earlier January phone conversation between Evans and Van Doren, they both expressed an intent to reach an agreement which Evans would memorialize. The Evans letter, as promised in the phone conversation, lays out the essentials of the agreement, and with Rice's confirmatory letter serves as a complete record of what was agreed upon at the January 19th meeting. *Cf. Knight v. Electric Household Util. Corp.*, 133 N.J.Eq. 87, 30 A.2d 585, 586 (Ch.1943), *aff'd* 134 N.J.Eq. 542, 36 A.2d 201 (1944).

In his confirmatory letter, Rice explicitly agrees to the terms as explained in the Evans letter. He writes, "[W]e think the terms of our agreement outlined in your letter to Don Van Doren dated January 27, 1984, are acceptable." The remainder of his letter merely offers some clarifications, and discusses a term of the agreement, payment schedule, which had been left open. There is nothing in this letter nor anywhere else that indicates that the Evans letter, in combination with the Rice letter, is *not* a complete and accurate memorialization of the agreement between parties.

> A. I don't recall that they did.
> Q. You didn't talk about it.
> A. I don't recall that I did.

Nonetheless, Vanguard argues in its reply that Lightnet's January 27, 1984, confirmatory letter "establishes Vanguard's entitlement to commission without regard to any question of causation."

---

1. The district applied New Jersey law, as do we. It is undisputed that New Jersey substantive law applies in this case.

2. Van Doren was plaintiff's only representative at the January 19th meeting. In his deposition, he testified as follows:

> Q. Did you make an assumption that it made no difference whether Vanguard was involved in the effort to make the sale or not?
> A. I didn't make that assumption. I didn't think about these things at that time.
>     *   *   *   *   *   *
> Q. No one else talked about it?

■ The parties, although inexplicably arguing oral contract theory, seem to explicitly accept they had reached a written agreement. Throughout their briefs, and at oral argument, they emphasize the importance of the Evans letter, and much of the dispute is over the true meaning of that letter. Vanguard noted in its initial complaint to the district court, "The essential terms of the Agreement were then memorialized in a January 27, 1984, letter from Lightnet to Vanguard." Lightnet also accepts this position throughout the litigation, including in its brief to this court. We therefore hold that when the parties to a transaction have memorialized its terms in writing, even if it be by an exchange of correspondence, they have entered into a written contract.

Because the contract is a written agreement, we are bound by its terms, and our role is to discern the "general purpose of the agreement, as expressed by the words employed, when read and construed as a whole." *Goldberg v. Commercial Union Ins. Co. of N.Y.*, 78 N.J.Super. 183, 188 A.2d 188, 191 (App.Div.1963). In performing this task, it is our function to "enforce it [the contract] as written and not to make a better contract for either of the parties." *Klacik v. Kovacs*, 111 N.J.Super. 307, 268 A.2d 305, 307 (App.Div.1970) (quoting *Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 161 A.2d 717, 720 (1960)).

■ The written agreement in this case does not contain a specific definition of how much effort would be required for Vanguard to earn a commission. New Jersey common law, though, presumes that when a brokerage contract is silent as to the service required to earn a commission from a seller or buyer, a commission will be earned only if the broker was the "efficient producing cause" of the sale. *De Bendic-*

*tis v. Gerechoff*, 134 N.J.Super. 238, 339 A.2d 225, 228 (App.Div.1975); *Inventive Music Ltd. v. Cohen*, 617 F.2d 29, 32 (3d Cir.1980). This presumption is based on public policy intended to effectuate justice between the parties and is not intended to rewrite an agreement which the parties deliberately executed. *See Stevenson Co. v. Oppenheimer*, 91 N.J.L. 479, 104 A. 88 (Sup.1918).

■ To overcome this presumption, an agreement must contain language which explicitly negatives the presumption. The contract language presented must be "without qualification, and ... emphatic and specific in statement." *Id.* 104 A. at 88; *see also Ettinger v. Loux*, 96 N.J.L. 522, 115 A. 384 (1921); *Martin Realty Co. v. Fletcher*, 103 N.J.L. 294, 136 A. 498 (Sup.1927). Absent language which specifically abrogates the common law presumption, that presumption prevails; commissions will only be awarded to a broker who was the efficient cause of the sale.[3]

■ In this case we are not given any language in the agreement itself, as memorialized in the two letters, to rebut the presumption. We do not require any "magic words" to establish the right to commission regardless of responsibility; we merely require some operative words to that effect. Neither of the letters contains language requiring commission to Vanguard on any sale, or on sales specifically made by Lightnet, nor is there language giving Vanguard an exclusive right to sell Lightnet capacity to companies on the Account List. For this court to hold that the agreement gave Vanguard a right to commissions on all sales to companies on the Account List would require us to enlarge our role from contract construction to con-

---

**3.** This is a lower burden than the burden imposed by the trial court under *Holiday Homes. Holiday Homes* would require not only that the agreement explicitly negative the presumption, but also that it do so in a "clear and unambiguous manner." We conclude that *Holiday Homes* is inapposite to a non-real estate context where the agreement is negotiated by sophisticated businessmen, as opposed to a form sales contract signed by the typical homeowner, fre-

quently for the first time and using unfamiliar terms. Thus, if the agreement in this case were to contain language which abrogated the effect of the presumption, yet was somewhat ambiguous, we would not hold, as the trial court read *Holiday Homes* to suggest, the ambiguous clause necessarily inoperative. Instead, we would remand for an analysis of the parties' intent with respect to the ambiguity.

tract reformation, a role we decline to assume under the facts of this case.

The agreement does not even imply that Vanguard would be due commissions upon sales made by Lightnet. Noting that the parties had agreed carefully to delineate their obligations to each other, reading the agreement as a whole there is not the slightest hint that Vanguard would be due commission on sales or leases regardless of any participation by it in the transaction. If anything, the agreement attempts to limit any financial commitment by Lightnet to Vanguard except as to specific customers "mutually agreed upon in advance." Additionally, the Rice letter anticipates Vanguard's active "involvement" in any sales for which it receives commission. Rice wrote, "We would like to move more of the commission to the contract signing point since our involvement will typically terminate at that point." Thus, the implications which can be drawn from the agreement as a whole support the application of the common law presumption. Hence, as a matter of law, the agreement between Lightnet and Vanguard gave Vanguard a right to a commission only on transactions of which it was the efficient cause.

### B.

The trial court ruled that there was insufficient evidence to support a finding that Vanguard caused either the sale of Lightnet capacity to United or the lease to Americall. Vanguard contends, however, that they had contact with both of these companies, and in the case of United, brought the opportunity to the attention of Lightnet, and thus summary judgment is inappropriate.

■ Under New Jersey law, for a broker to earn a commission, the broker must: establish that he was the "efficient cause" in bringing about the sale—at least in the sense of causing the seller to negotiate with a customer, produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations.

*Inventive Music*, 617 F.2d at 32. As a general rule, this is a question which should be left to the jury. *Id.* Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On review, this court must apply the same analysis. *Goodman v. Mad Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Lightnet presented overwhelming evidence that Vanguard played no role in putting together the United or Americall deals, including depositions from executives at United and Americall who deny any involvement by Vanguard. Vanguard's contentions that it sent proposals or discussed Lightnet with executives of these companies are not enough to fulfill its burden of proof, given Lightnet's compelling evidence. To this extent, summary judgment is appropriate.

■ In terms of the Americall deal, Americall President Barry Vaughn denies that Vanguard, or any of its principals, had anything to do with his leasing Lightnet capacity. Lightnet had had contact with Americall prior to any involvement by Vanguard, and it was on the basis of this contact that he claims to have consummated the deal. As Vaughn testified:

Q. . . . Did Mr. Rice tell you anything about LIGHTNET that you did not already know yourself from your previous contacts with LIGHTNET?

A. No, he didn't. As a matter of fact I felt that I was as informed or more informed than he was.

In the face of this denial of involvement, Vanguard offers little more than its assertion that it had contacted Americall through Vaughn a short time prior to the negotiations between Americall and Lightnet which ultimately led to the contract. It is inconceivable that a reasonable jury would determine, given this evidence, that Vanguard was the "efficient cause" of this transaction.

■ The evidence relating to United is similar. United, a large local telephone company, had been in contact with CSX prior to the formation of Lightnet concerning a possible use of CSX's rights of way. Ultimately, CSX, after beginning the Lightnet joint venture with SNET, informed United that it would consider a transaction, though not for rights of way, involving Lightnet, and not CSX directly. An agreement in principle was reached between the parties in November 1984 and the final agreement was signed in March 1985.

Vanguard, despite this history of negotiations between Lightnet and United, claims that it was the cause of the agreement.[4] It asserts that it encouraged Lightnet to pursue United, after the initial negotiations between Lightnet and United had become dormant. Rice also made contact with United Vice President Mont Williams in April 1984 and suggested that Lightnet would be a viable option for United and encouraged him to meet with Lightnet directly.

Lightnet, though agreeing that Rice had encouraged it to pursue United, denies any larger role by Vanguard. It points to its past and then continuing negotiations with United to rebut Vanguard's assertion that Vanguard had identified United as a potential client. It again presents depositions from United executives who deny that Vanguard, or Rice, played any role whatever in the transaction or its negotiations. Vanguard never attended any meetings between these parties and never participated in any of the negotiations. In the face of this evidence, no reasonable jury could find that Vanguard was the efficient cause of the United transaction.

### III.

■ Vanguard's second contention is that the trial court erred in granting summary judgment on its claim for breach of fiduciary duty. Vanguard explained the claim in its brief before this court:

[G]iven the substantial disparity between Lightnet and Vanguard and given the fact that Vanguard has been placed in its vulnerable position by having invested so much of its time and limited resources to the marketing of Lightnet based upon the promises of first Wolf and then Evans that their agreements would be honored in the absence of a formal contract, a jury could well conclude that the factual predicate for a fiduciary relationship existed and had been breached by Lightnet.

The trial judge granted summary judgment on this issue without any discussion or explicit findings.

Vanguard offers little more than rhetoric and general legal theory to support its claim. Essentially, it argues that Vanguard was induced by Lightnet to let down its guard, and as a result was to a certain extent swindled into working without proper compensation. Even assuming, *arguendo*, that there are occasions where a principal owes a fiduciary obligation similar to the one here claimed to its agent, on the basis of the evidence before this court no reasonable jury could find that Lightnet owed or breached a fiduciary obligation to Lightnet.

First, Vanguard received payment for time and expenses in excess of $47,000 for its efforts to develop sales on behalf of Lightnet. This was paid notwithstanding Vanguard's failure to consummate even one sale. Second, as we construe the contract, Lightnet precisely lived up to the obligations to which it agreed with Vanguard. To this extent, holding that there was no breach of contract implies that there was no breach of a fiduciary duty.

Vanguard is also incorrect in stating that there was a substantial disparity in the bargaining power of the parties. Vanguard consisted of experienced and astute businessmen with long track records in the communications industry. It had solicited Lightnet claiming to have expertise in market segments in which Lightnet was either

---

**4.** None of the invoices submitted by Vanguard to Lightnet for time and expenses in marketing related to contacts with United or Americall.

inexperienced or not well placed. Vanguard also had a fair opportunity to protect its interests, and its construction of the agreement, in the contract drafting stage. If it did not believe that the agreement as memorialized in the letter from Evans properly represented their understanding, it could have refused to agree to the terms. Instead, it sent a response which, though recognizing Vanguard's ability to clarify and amend the agreement, made no mention of its understanding of the Account List concept and accepted the Evans letter as a complete memorialization. Given these undisputed facts, Vanguard fails to allege a cognizable claim for breach of fiduciary duty.

## IV.

Vanguard's final contention is that the trial judge erred in failing to grant leave to make a second amendment to its complaint to add a claim of fraud. Vanguard, in reliance upon its prior pleadings, and the evidence submitted in support of those pleadings, requested leave to amend its complaint to add:

> At the time of entering into the said Agreement, it was defendants' intention not to honor the said Agreement; defendants intended plaintiff to rely upon their conduct in entering in the Agreement, which plaintiff did to its injury. Defendants' conduct as set forth above, as well as in other regards was fraudulent, and was part of and constituted a scheme to defraud plaintiff.

(Letter–Opinion at 3). The trial court denied Vanguard leave to amend, ruling that under New Jersey law fraud is not cognizable in commercial disputes arising from frustrated economic expectations. *See Werner & Pfleiderer Corp. v. Gary Chemical Corp.*, 697 F.Supp. 808, 814–15 (D.N.J. 1988); *Unifoil Corp. v. Cheque Printers*

*and Encoders, Ltd.*, 622 F.Supp. 268, 270 (D.N.J.1985). The trial court also added that "[e]ven if the proposed Vanguard amendment were permitted, summary judgment would be appropriate on the claim."

The question of the continuing validity of fraud claims in cases involving frustrated economic expectations under New Jersey law is very complex and troublesome. The United States District Court for New Jersey unequivocally has held that the New Jersey Supreme Court's reasoning in *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), though not explicitly addressing fraud claims, "leads ... to the conclusion that, as between commercial parties New Jersey will not countenance" claims for fraud other than fraud in the inducement. *Unifoil Corp.*, 622 F.Supp. at 270–71. *Spring Motors* held that "as among commercial parties ... contract law, ... provides the more appropriate system [as compared to tort law] for adjudicating disputes arising from frustrated economic expectations." 489 A.2d at 673.

■ Contrary to this proposition, the New Jersey Superior Court after *Spring Motors* has upheld fraud claims between commercial parties, *see Perth Amboy Iron Works, Inc. v. American Home Assurance Company*, 226 N.J.Super. 200, 543 A.2d 1020 (App.Div.1988), *cert. granted*, 115 N.J. 60, 556 A.2d 1207 (1989). No New Jersey court, though, has explicitly considered whether these claims are barred by *Spring Motors*. Because we determine that plaintiff fails to allege sufficient facts to support its claim of fraud, making summary judgment proper, we decline to wade into this morass.[5]

Under New Jersey law, legal fraud is "a material misrepresentation of a presently

---

5. We recognize that it is inappropriate to "enter summary judgment upon a proposed amendment without first granting the motion to amend." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 614 (3d Cir.1987). But, as that case recognizes, if a trial judge does grant summary judgment prior to granting the motion to amend, and summary judgment is *appropriate*, the failure to amend will constitute harm-

less error. *Id.* at 615 (the court reversed because it found that summary judgment was inappropriate). Thus, in this case, assuming *arguendo* that the trial court was incorrect in ruling that New Jersey law does not recognize a cause of action for commercial fraud, its failure to grant the motion to amend was harmless error in the face of its proper conclusion regarding summary judgment.

existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 432 A.2d 521, 524 (1981). Vanguard contends that Lightnet deceived it by expressing an intention to pay commissions for all sales, and that it relied upon this assertion to its detriment. Though it is factually conceivable that Lightnet did at some point express an intention to pay Vanguard for all sales, there was no detrimental reliance by Vanguard.

Vanguard's principals were sophisticated businessmen. They were at all times involved in attempting to draft an agreement which would govern Vanguard's relationship with Lightnet. Given their sophistication, and their involvement, they could have structured the agreement so as to provide for commissions regardless of responsibility, or they could have refused to enter any agreement which did not so provide. This they failed to do. Their failure cannot reasonably be related to any misrepresentation by Lightnet, but instead to their own sloppy draftsmanship or an acceptance of their very limited bargaining power.

Vanguard also had the ability, and in fact exercised it through Rice's letter to Evans, to clarify the agreement. Its failure to clarify the terms regarding when compensation was due was not induced by any statements by *Lightnet.* Because any detriment which it suffered can be traced to the agreement, and Vanguard entered into the agreement willingly and had equal ability to evaluate the legal consequences of it, there was no detrimental reliance. Thus, summary judgment on this claim is appropriate.

## V.

In sum, we hold that the trial court properly ruled that Vanguard failed to plead facts sufficient to support its claims for breach of contract, breach of fiduciary duty, and legal fraud. The court therefore properly granted summary judgment on all of these causes of action.

Accordingly, the district court's judgment will be affirmed in all respects.