UNITED STATES of America

v.

AMERICAN INSURANCE COMPANY, Appellant.

No. 93–3325.

United States Court of Appeals, Third Circuit.

Argued Jan. 10, 1994.

Decided March 15, 1994.

Robert F. McCabe, Jr. (argued), Edward B. Lee, III, Lindsay, McCabe & Lee, Pittsburgh, PA, for appellant American Ins. Co.

Bruce R. Ellisen, Richard Farber, Edward T. Perelmuter (argued), Kevin M. Brown, Dept. of Justice, Tax Div., Washington, DC, for appellee U.S.

Before: STAPLETON, COWEN and ALITO, Circuit Judges.

**OPINION OF THE COURT**

COWEN, Circuit Judge.

Appellant American Insurance Company ("American") posted a surety bond guaranteeing payment of overdue tax obligations owed by the Wheeling–Pittsburgh Steel Corporation ("Wheeling–Pitt") to the United States. Upon Wheeling–Pitt's default, the United States obtained a judgment against American when it refused to honor its surety contract obligation. American concedes it is liable to the United States for interest on the judgment from the date of Wheeling–Pitt's default. This appeal raises the issue as to whether interest after default should be calculated at the rate established by the Internal Revenue Code as the district court determined, or whether it should be calculated under the terms of the Debt Collection Act of 1982 as American argues. We hold that American contracted to pay the taxpayer obligations of Wheeling–Pitt and, thus, the Internal Revenue Code interest rate applies.

## I.

This is the second time this case has come before us. As was the case in the first appeal, the significant facts are stipulated and are not in dispute. In 1981 Wheeling–Pitt had an outstanding federal tax liability of nearly $5,000,000 for the years 1962 through 1973. In order to settle the resulting dispute with the Internal Revenue Service ("IRS") concerning payment, Wheeling–Pitt entered into a collateral agreement to pay its taxes and interest, including interest accruing in the future, in five annual installments commencing on August 20, 1982, and ending on August 20, 1986. This collateral agreement was signed by the Chairman of Wheeling–Pitt on October 27, 1981, and was signed by the District Director of the IRS on February 19, 1982.

The collateral agreement obligated Wheeling–Pitt to obtain "a bond in an amount equal to one and one-half the amount of the total outstanding tax and interest liability ... and payable on demand" to the IRS. Appendix ("App.") at 16. As Wheeling–Pitt made annual payments reducing its outstanding tax liability, the bond principal could be reduced.

At the outset, Wheeling–Pitt obtained a bond from Federal Insurance Company ("Federal"), dated October 27, 1981, in the principal amount of almost $7,500,000. The bond is a relatively simple contract that obligated the surety to pay the IRS any money owed and not paid by Wheeling–Pitt under the collateral agreement.[1] The bond further provided for a penalty sum limited to the face amount, which again would be reduced with each payment made by Wheeling–Pitt to the IRS.

After Wheeling–Pitt made its first payment, Federal canceled the bond. Thereafter on June 15, 1983, American provided a replacement bond which American acknowledges by way of stipulation contains "the same terms and conditions as the original bond," except for a reduced penalty amount. App. at 11. Hence, the replacement bond posted by American incorporates by reference the collateral agreement between Wheeling–Pitt and the IRS. The bond ultimately was reduced to a face (and penalty) amount of $2,124,003 as a result of Wheeling–Pitt's payments to the IRS under the terms of the collateral agreement. During this time period Wheeling–Pitt's financial condition was rapidly deteriorating, which resulted in the company filing a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania on April 16, 1985. This filing constituted a default event under the terms of the collateral agreement and allowed the IRS to demand payment in full on the bond from American.

The IRS made a demand for $1,581,197.02 from American under the bond on May 6, 1985. American refused to honor the bond and notified the IRS that it was canceling the bond under the terms of a thirty-day cancellation provision contained in the bond. The United States brought a civil action against American in the United States District Court for the Western District of Pennsylvania for payment according to the terms of the bond. American defended its failure to pay on the theory that the bond only guaranteed timely payment according to the terms of the collateral agreement; since Wheeling–Pitt had made all payments when due, American retained the right to terminate the bond under the thirty-day cancellation provision prior to the next scheduled collateral agreement payment.

The district court entered judgment for American, which order was reversed on appeal by this court. *United States v. American Ins. Co.*, 983 F.2d 1052 (3d Cir.1992) (table); *see id.*, No. 92–3275, slip op. at 7–10 (3d Cir. Dec. 29, 1992) (unpublished opinion). We recognized that the bond expressly incorporates the collateral agreement and held that American agreed by the terms of its surety contract to allow the IRS to "make demand on the bond when Wheeling–Pitt petitioned in bankruptcy." *Id.*, slip op. at 8. Since "that is exactly what happened," American effectively defaulted on its surety obligation to pay the United States when it made demand under the bond. *Id.* We remanded the case to the district court for determination of the total amount due, as well as for the district court to consider what amount of prejudgment interest was owed. *Id.*, slip op.

---

**1.** In relevant part the language of the bond states:

> KNOW ALL MEN BY THESE PRESENTS, that we, WHEELING–PITTSBURGH STEEL CORPORATION, (hereinafter called "PRINCIPAL"), as PRINCIPAL, and the FEDERAL INSURANCE COMPANY, ... (hereinafter called "SURETY"), as SURETY, are held and firmly bound unto the INTERNAL REVENUE SERVICE, as set forth below, good and lawful money of the United States of America, for the payment of which well and truly to be made, we bind ourselves, our ... successors and as-

signs, jointly and severally firmly by these presents.

> . . . . .

> WHEREAS, the above bounden PRINCIPAL has entered into a certain written Collateral Agreement with above named OBLIGEE, dated the 27th day of October, 1981; said Collateral Agreement herein referred to is hereby made a part of subject Bond, and;
>
> WHEREAS, the Collateral Agreement provides for payment by the PRINCIPAL to the OBLIGEE, of certain sums due or to become due under the terms thereof.

App. at 20.

at 10–11. American did not appeal our judgment and order in favor of the United States.

On remand, American first contended that it owed no interest on the obligation. Alternatively, if interest was owed, American argued that the rate should be determined according to Pennsylvania law. The IRS argued that interest should be computed pursuant to the Internal Revenue Code, I.R.C. § 6621.[2] The parties entered into a stipulation as to the amount of interest that would be due under Pennsylvania law and under the Internal Revenue Code, and they agreed that American's liability under any scenario could not exceed the penalty amount of the bond, $2,124,003. In a memorandum opinion filed on June 4, 1993, the district court concluded that interest was owed and that the applicable rate was that of the Internal Revenue Code. The district court stated:

> [American] contracted, by issuance of the Bond, to pay the full liability of the taxpayer for unpaid taxes and interest should it become obligated on the bond. The interest liability surely is determined by 26 U.S.C. § 6621 and not Pennsylvania law, since the defendant as a paid surety has contractually agreed to pay the taxpayer's liability which is computed by the Internal Revenue Code.

**2.** I.R.C. § 6601(a), which cross-references I.R.C. § 6621, provides the general rule for the payment of interest on underpaid tax obligations:

> If any amount of tax imposed by this title (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.

I.R.C. § 6601(a) (1988). The formula for determining the amount of interest owed on any underpaid tax obligation is contained in I.R.C. § 6621(a), which states in full:

> (a) General rule.—
> (1) Overpayment rate.—The overpayment rate established under this section shall be the sum of—
> (A) the Federal short-term rate determined under subsection (b), plus
> (B) 2 percentage points.
> (2) Underpayment rate.—The underpayment rate established under this section shall be the sum of—

*United States v. American Ins. Co.*, No. 87–1345, slip op. at 2, 1993 WL 643375 (W.D.Pa. June 4, 1993) (unpublished memorandum opinion), App. at 44. The district court expressly incorporated the Internal Revenue Code rate of interest into the judgment in favor of the United States. *See* App. at 45; *see also infra* note 5.

American then filed a motion for reconsideration, arguing that prejudgment interest could accrue only at the rate established by the Debt Collection Act of 1982, 31 U.S.C. § 3717(a).[3] The district court entered an order rejecting this contention on June 24, 1993, from which American appeals.

## II.

■ The district court had jurisdiction over this civil action brought by the United States against American pursuant to 28 U.S.C. §§ 1340 and 1345. American appeals the final order of the district court awarding prejudgment interest to the United States at the Internal Revenue Code rate and rejecting American's contention that the Debt Collection Act should govern this interest determination. Thus, we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.[4]

■ With this appeal, American presents the narrow issue as to what prejudgment

> (A) the Federal short-term rate determined under subsection (b), plus
> (B) 3 percentage points.
>
> *Id.*

**3.** The Debt Collection Act of 1982, which provides for the payment of interest on outstanding debts to the United States, states in relevant part:
> The head of an executive or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person that is equal to the average investment rate for the Treasury tax and loan accounts for the 12–month period ending on September 30 of each year, rounded to the nearest whole percentage point.

31 U.S.C. § 3717(a)(1) (1988).

**4.** We properly consider the arguments raised by American in its motion for reconsideration, even though they were not initially presented to the district court, because these contentions were ultimately presented to and considered by the district court prior to its entering a final order. *Cf. Tabron v. Grace*, 6 F.3d 147, 154 n. 2 (3d Cir.1993) ("As a general rule we do not consider on appeal issues that were not raised before the

interest rate should apply, given its concession that some interest is owed.[5] Our consideration of this issue turns on the appropriate legal construction of the terms of the bond, a contract, over which we have plenary review. *USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433, 437 (3d Cir.1993); *Vanguard Telecommunications, Inc. v. Southern New England Tel. Co.*, 900 F.2d 645, 650 (3d Cir.1990). Our task of construing the contract between the parties to determine which interest rate applies is distinguishable from situations where we review a district court's decision to grant or deny prejudgment interest altogether for abuse of discretion. *See Ambromovage v. United Mine Workers of America*, 726 F.2d 972, 982–84 (3d Cir.1984).

### III.

American acknowledges that it is liable for prejudgment interest to the United States from the date when the IRS made its demand for payment under the bond. Furthermore, American concedes that the determination of the appropriate rate of interest is a "federal" issue to be governed by federal statute or by federal common law. Contrary to what the district court held, however, American argues that interest should be calculated under the terms of the Debt Collection Act of 1982, 31 U.S.C. § 3717(a), rather than under the terms of the Internal Revenue Code, I.R.C. § 6621. In support of this position, American contends that it is only a surety with respect to Wheeling–Pitt's liability under the collateral agreement, and thus should not be treated as the taxpayer, who would be subject to prejudgment interest as determined by the Internal Revenue Code.

American further develops this argument by noting that there is only one taxpayer involved in this dispute, and that taxpayer is Wheeling–Pitt, not American. Because American is only a surety, and not the actual taxpayer, American contends that its liability is a matter of contract, and one that is not a tax obligation *per se*. According to American, the Internal Revenue Code interest provisions cannot apply to garden variety contract obligations owed to the United States. Furthermore, American contends that *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941), is dispositive of the present issue.

In *Royal Indemnity*, the IRS accepted a surety bond from a taxpayer in lieu of proceeding with collection of an assessment, pending the outcome of the taxpayer's claim in abatement. *Id.* at 292, 61 S.Ct. at 996. The IRS granted the claim in abatement in part and rejected the claim in part; in the interim, interest had accrued on the portion of the assessment the IRS had determined to be payable. *Id.* at 293, 61 S.Ct. at 996. Upon demand the surety paid only the principal due, and the IRS collector surrendered the bond to the surety with a receipt stating that all liability on the bond had terminated. *Id.*

The United States sued the surety for the amount of the interest which had accrued but had not been collected from the taxpayer. After holding that the IRS collector did not have authority to release a bond guaranteeing the taxpayer's interest obligation, *id.* at 294–95, 61 S.Ct. at 997, the Supreme Court stated:

> [The surety's] obligation was contractual to pay an amount found to be due from the taxpayer and the suit against it is for a debt ex contractu, due and owing in conformity to the terms of the bond.
>
> A suit upon a contractual obligation to pay money at a fixed or ascertainable time is a suit to recover damage for its breach, including both the principal amount and interest by way of damage for delay in payment of the principal after the due date.

*Id.* at 295–96, 61 S.Ct. at 997 (citation omitted). From this passage, American concludes that the action brought by the United States pursuant to the surety bond is one in contract, not tax, to which only the Debt Collection Act of 1982 can govern an interest calculation.

---

district court."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1306, 127 L.Ed.2d 657 (1994).

**5.** Technically, this dispute involves both prejudgment and postjudgment interest because the judgment of the district court ordered that "prejudgment interest shall accrue ... to entry of judgment ... and until paid in accordance with the rate established by the Internal Revenue Code." App. at 45.

■ We agree with American that *Royal Indemnity* is the relevant legal authority which provides the starting point for our disposition of the present issue. Furthermore, we agree that *Royal Indemnity* makes clear that the present action by the United States against American, the surety for taxpayer Wheeling–Pitt, is a contract suit. Nevertheless, we cannot agree that *Royal Indemnity* stands for the proposition that federal law requires that the Debt Collection Act, rather than the Internal Revenue Code, operate to determine American's interest liability as a surety for Wheeling–Pitt's tax obligation. Rather, our reading of *Royal Indemnity* leads us only to the conclusions that the present action is one in contract, *see id.*, that the interest determination "is not controlled by state statute or local common law," *id.* at 296, 61 S.Ct. at 997–98, that a federal statute may control the interest determination, *see id.*, and that "[i]n the absence of an applicable federal statute it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for nonpayment of the amount found to be due," *id.* at 296, 61 S.Ct. at 998.

■ Thus, in our view *Royal Indemnity* is not dispositive; rather, it directs the district court, and this court on review, to examine whether any federal statute operates to control the prejudgment interest determination. In the present dispute, American argues that the Debt Collection Act controls, while the IRS responds that the Internal Revenue Code interest rate provision controls. Given this "choice" between two federal statutes, we must examine the terms of the contract to see if it explicitly states which of the two should apply. A review of the applicable provisions of the bond, as well as the collateral agreement which is expressly incorporated into the bond, reveals that the parties did not specifically designate either of the two statutes to apply to such a prejudgment interest calculation.[6] Therefore, we must further examine the terms of the contract to see if by

its legal operation one of the two federal statutes must implicitly control.

With respect to the bond, American argues that the nature of its obligation after Wheeling–Pitt's default is one of a fixed contract amount, unlike a tax obligation that is subject to interest and penalties by the taxpayer in the event the tax obligation goes unpaid. Further, American argues that its failure to pay the IRS upon demand was reasonable in light of its interpretation of the bond, which the district court subsequently agreed with, and that American should not be treated any differently than any other contract debtor who fails to pay an obligation to the United States, opting instead to litigate in the courts.

We again part company with the position advocated by American because we disagree with American's characterization of the nature of its surety bond obligation. The bond is simply a contract executed by American as surety and Wheeling–Pitt as taxpayer-debtor whose terms define the nature of this surety-ship relationship. *See* 10 Walter H.E. Jaeger, *Williston on Contracts* § 1211, at 684 (3d ed. 1967). Rather than establishing a routine debtor-creditor relationship, the surety bond obligated American to stand in the shoes of the taxpayer Wheeling–Pitt in the event Wheeling–Pitt violated the collateral agreement it negotiated with the IRS. 11B John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 6791, at 96–97 (1981) ("A surety is liable to the same extent as the principal unless the obligee violates some provision of the bond or commits some act to the prejudice of the surety's rights."). Several provisions of the bond lead us to this inescapable conclusion.

First, the principal governing language of the bond specifically states that American and Wheeling–Pitt, the taxpayer, are jointly and severally liable for the taxpayer's liability to the IRS. *See supra* note 1. The scope of the taxpayer's liability to the IRS is set out in the collateral agreement, which is also

---

6. That the contract is silent is hardly a surprising circumstance, especially given the fact that the original bond and collateral agreement were signed by Wheeling–Pitt's representative on October 27, 1981, while the interest provision of the

Debt Collection Act of 1982 was not added until January 12, 1983. *See* Pub.L. No. 97–452, § 1(16)(A), 96 Stat. 2472–73 (codified at 31 U.S.C. § 3717).

expressly incorporated into the bond. By its very terms, the collateral agreement obligates Wheeling–Pitt to pay its overdue "tax and interest liability *plus statutory accruals.*" App. at 15, 16 (emphasis added).[7] Although the collateral agreement does not expressly state that such statutory accruals are to be calculated at the applicable Internal Revenue Code rate, namely I.R.C. § 6621(a)(2), that provision necessarily applies because this is a contract for the payment of overdue tax that was executed between the taxpayer and the IRS. I.R.C. § 6601(a) ("If any amount of tax imposed by this title ... is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid....."). Since American assumed joint and several liability for this taxpayer obligation, it, like the taxpayer itself, is subject to interest accruals at the rate determined by the Internal Revenue Code.

Second, the bond contains an express provision stating that the collateral agreement shall have binding effect until Wheeling–Pitt makes all the scheduled payments. This language, which is reprinted in the margin,[8] necessarily implies that the collateral agreement continues to have binding effect even in the event the taxpayer Wheeling–Pitt defaults on its payment obligations. Thus, even though Wheeling–Pitt defaulted by filing a bankruptcy petition, the collateral agreement continues as a binding portion of the third-party beneficiary contract relationship between American and the IRS because the bond expressly incorporates the collateral agreement. From this language we must conclude that the nature of the surety relationship between American and Wheeling–Pitt is one in which American steps into the taxpayer's shoes upon default.

We find further support for this conclusion from the practical import of American's own decision to contest its liability under the terms of the bond. Whenever ordinary taxpayers forgo the payment of tax obligations in order to contest their liability, they are subject to an increased judgment which includes interest calculated under the terms of the Internal Revenue Code when the tax is found to be owed. *See id.* In the present case, American forced the United States to pursue court litigation to collect the amount of its demand pursuant to the bond; in effect, American contested its liability by failing to pay. Although American initially prevailed in court, ultimately American was wrong in its interpretation of the terms of the bond and collateral agreement and it was held to be liable. Because its liability is coextensive with that of the taxpayer, American should be held responsible for the delay the United States has incurred in collecting Wheeling–Pitt's tax obligation.

In short, in the present circumstances we find unpersuasive American's contention that the United States should not be able to col-

7. We note that the collateral agreement makes an explicit provision for statutory accruals in the paragraphs delineating Wheeling–Pitt's obligation to make five annual payments on August 20 for the years 1982 through 1986. *See* App. at 15, 16. However, even though the contract contains an apparent termination date for statutory accruals of August 20, 1986, the governing IRS statute provides for accruing interest on all underpaid tax obligations until paid. I.R.C. § 6601(a); *see supra* note 2. Because we conclude that American contracted for coextensive liability with Wheeling–Pitt with respect to the tax obligations contained in the collateral agreement, both are subject to IRS interest accruals beyond August 20, 1986, and until paid. Therefore, the fact that the contract expressly subjects Wheeling–Pitt to statutory accruals only until August 20, 1986 does not in any way affect our conclusion that American is obligated to pay interest at the Internal Revenue Code rate. Furthermore, American argued only that the Debt

Collection Act should apply from the date of Wheeling–Pitt's default, not that the IRS rate might apply until August 20, 1986, but could not apply after that date. American has waived any argument concerning an apparent termination date for statutory accruals because it did not set forth such a position as an issue presented, nor did American pursue this issue in the argument section of its brief. *Nagle v. Alspach,* 8 F.3d 141, 143 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1337, 127 L.Ed.2d 685 (1994).

8. The bond states:

NOW, THEREFORE, the condition of this obligation is such, that if the above bounden PRINCIPAL shall make all payments due to the OBLIGEE under the terms and conditions of said Collateral Agreement, then this obligation shall be null and void; *otherwise to remain in full force and effect.*

App. at 20 (emphasis added).

lect what it bargained for in the collateral agreement given that American caused a collection delay by unsuccessfully contesting its own liability. Although not central to its holding, the Supreme Court relied on this rationale for its decision in *Royal Indemnity:*

> Here responsibility for delay in payment rests quite as much upon the debtor, who is chargeable with knowledge of its own obligation and the breach of it, as upon the creditor. And in the meantime the debtor has had the use of the money, of which its default has deprived the creditor. Interest upon the principal sum from the date of default, at a fair rate, is therefore an appropriate measure of damage for the delay in payment.

313 U.S. at 296–97, 61 S.Ct. at 998. If American had paid its contractual obligation when the United States initially made demand, interest would not have accrued in the first instance.

Furthermore, we reject American's contention that the Internal Revenue Code interest rate is punitive in nature under the present circumstances. As we have already stated, American's liability for the obligation imposed by the collateral agreement is coextensive with that of the taxpayer Wheeling–Pitt. Since Congress has determined that it is reasonable for the United States to collect interest on underpaid tax obligations at the rate established by I.R.C. § 6621(a)(2) from taxpayers, it is likewise reasonable for American as a taxpayer's surety to be held liable for prejudgment interest at the same rate.

We also reject American's contention that subjecting it to liability for interest calculated under the Internal Revenue Code penalizes the company for litigating its liability in a court of law. This argument lacks merit with respect to any taxpayer or taxpayer's surety who contests a tax obligation and risks having Internal Revenue Code interest apply in the event it is found liable. We also note that American had at least one alternative course of action open to it. Just like any ordinary taxpayer, American could have paid

the IRS' demand and then contested its liability directly to the IRS. The Secretary of the Treasury has authority to refund overpayment of tax obligations, which under I.R.C. § 6401(c) include payments made even though no actual tax liability in fact existed. I.R.C. § 6402(a). If the Secretary disagreed with American, American then could have filed suit against the United States in federal court. In the event American had prevailed in such an action, the IRS would have been liable to American for prejudgment interest on the overpayment as calculated under the Internal Revenue Code, I.R.C. § 6621(a)(1).

By posting the bond, American agreed to pay Wheeling–Pitt's overdue tax obligations as set out in the collateral agreement in the event Wheeling–Pitt did not pay. These concomitant tax obligations include accruing interest for nonpayment calculated at the Internal Revenue Code rate. Therefore, we hold as a matter of law that a surety such as American is obligated to pay interest on the taxpayer's unpaid tax liability at the rate determined by the Internal Revenue Code, not the Debt Collection Act, when the surety has posted a bond incorporating the taxpayer's obligation to pay IRS statutory accruals.[9]

### IV.

We will affirm the order of the district court. We conclude that American contracted for coextensive liability with that of taxpayer Wheeling–Pitt by the very terms of the surety bond. Because the parties have not stipulated as to whether interest accruing pursuant to I.R.C. § 6621 from the date of demand up until the date of payment in full would cause American's total liability to exceed the penalty amount of the bond, we must remand to the district court for it to calculate the total amount of the judgment. In the event the interest obligation does cause the judgment to exceed $2,124,003, the penalty amount, then the district court shall enter final judgment in favor of the United States for the penalty amount of the bond.

---

**9.** We agree with the district court that the terms of the contract require a federal statute, namely I.R.C. § 6621, to apply. Thus, it was not necessary for the district court to consider what interest rate would govern pursuant to federal common law, which is required by *Royal Indemnity* in circumstances where no federal statute applies. *See* 313 U.S. at 296, 61 S.Ct. at 998; *West Virginia v. United States*, 479 U.S. 305, 308–09, 107 S.Ct. 702, 705, 93 L.Ed.2d 639 (1987).

Otherwise, the district court shall enter a final judgment obligating American to pay interest in accordance with I.R.C. § 6621 on the judgment amount until paid. Costs taxed against the appellant.

STAPLETON, Circuit Judge, dissenting:

The existence and extent of a surety's obligations are determined by the suretyship agreement. As the Supreme Court held in *Royal Indemnity Co. v. United States,* 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941), even where the surety's promise is to pay a taxpayer's tax obligation, the obligations of the surety are limited to those that arise by virtue of the contract it entered. Where, as here, the subject of the suretyship is the principal's performance under a contract, the obligations of the surety are determined, and therefore limited, by the terms of the contract to be performed. It follows from *Royal Indemnity* that this is true even where the subject matter of that contract is the payment of delinquent taxes.

Wheeling–Pitt contracted to pay the sum of its overdue taxes and interest in installments over a period of time. The contract expressly provided that each installment payment would include the interest that would accrue on the unpaid portion of the principal sum during the installment period. The contract committed Wheeling–Pitt only to pay the stipulated periodic payments and, in the event of a default and acceleration, to pay the entire balance of such payments. Wheeling–Pitt's performance of these obligations is all American undertook to guarantee.

Wheeling–Pitt's contract says nothing about pre-judgment interest due in the event of a default under the agreement. If Wheeling–Pitt, following default, has a duty to pay prejudgment interest on the accelerated principal at a rate specified in the Internal Revenue Code, that duty arises from the Code and not from its contract with the Internal Revenue Service. It necessarily follows that American is not liable for interest at the rate claimed by the United States, and I would so hold.